## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

LAURA L. DIVANE AND APRIL HUGHES,
individually and as representatives of a
class of participants and beneficiaries on
behalf of the Northwestern University
Retirement Plan and the Northwestern
University Voluntary Savings Plan,

                *Plaintiffs*,

 v.

NORTHWESTERN UNIVERSITY,
NORTHWESTERN UNIVERSITY
RETIREMENT INVESTMENT
COMMITTEE, PAMELA S. BREENER,
RONALD R. BRAEUTIGAM, KATHLEEN
HAGERTY, CRAIG A. JOHNSON, CANDY
LEE, WILLIAM H. McLEAN, and INGRID
S. STAFFORD,

              *Defendants*.

Civil Action No. 16-cv-8157

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

1.     Plaintiffs Laura L. Divane and April Hughes individually and as representatives of a class of participants and beneficiaries of the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan (herein collectively referred to as the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendants Northwestern University, Northwestern University Retirement Investment Committee, Pamela S. Breener, Ronald R. Braeutigam, Kathleen Hagerty, Craig A. Johnson, Candy Lee,

William H. McLean, and Ingrid S. Stafford for breach of fiduciary duties under ERISA.[1]

2. The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plans, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plans' investments are prudent. The marketplace for retirement plan services is established and competitive. Billion-dollar defined contribution plans, like the Plans, have tremendous bargaining power to demand low-cost administrative and investment management services. Instead of using the Plans' bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plans, and retained high-cost and poor-performing investments compared to available alternatives.

3. To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plans, brings this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plans as the Court may deem appropriate.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside.

## PARTIES

### Northwestern University Retirement Plan

6.     The Northwestern University Retirement Plan ("Retirement Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Retirement Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

8.     The Retirement Plan provides for retirement income for certain employees of Northwestern University. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and performance of investment options net of fees and expenses.

9.     As of December 31, 2015, the Retirement Plan had $2.34 billion in net assets and 21,622 participants with account balances. It is one of the largest defined contribution plans in the United States.

## Northwestern University Voluntary Savings Plan

10.     The Northwestern University Voluntary Savings Plan ("Voluntary Savings Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

11.     The Voluntary Savings Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

12.     The Voluntary Savings Plan provides for retirement income for certain employees of Northwestern University. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation or employer matching contributions, and performance of investment options net of fees and expenses.

13.     As of December 31, 2015, the Voluntary Savings Plan had $529.8 million in net assets and 12,293 participants with account balances.

14.     With total assets well over $2 billion, the Retirement Plan is in the top 1% of all defined contribution plans in the United States based on total assets that filed a Form 5500 with the Department of Labor.

15.     Under the terms of the Retirement Plan, participants are eligible to contribute a discretionary amount of their annual compensation to the Plan and Northwestern makes a matching contribution. Participants in the Voluntary Savings Plan likewise may contribute a discretionary amount of their annual compensation, but Northwestern does not match those contributions.

16.     The Plans allow participants to designate investment options into
which their individual accounts are invested. Defendants exercise exclusive and
discretionary authority and control over the investment options that are included in
the Plans.

### Plaintiffs

17.     Laura L. Divane resides in Skokie, Illinois, and is a participant in the
Retirement Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or
may become eligible to receive benefits under the Plan.

18.     April Hughes resides in Wauconda, Illinois, and is a participant in the
Retirement Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or
may become eligible to receive benefits under the Plan.

### Defendants

19.     Northwestern University ("Northwestern") is a non-profit corporation
organized under Illinois law with its principal place of business in Evanston,
Illinois. Northwestern is the fiduciary responsible for the control, management and
administration of the Plans, in accordance with 29 U.S.C. §1102(a). Northwestern is
the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) with exclusive
responsibility and complete discretionary authority to control the operation,
management and administration of the Plans, with all powers necessary to enable
Northwestern to properly carry out such responsibilities, including the selection and
compensation of the providers of administrative services to the Plans and the
selection, monitoring, and removal of the investment options made available to

5

participants for the investment of their contributions and provision of their retirement income.

20.     Northwestern is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

21.     The Northwestern University Retirement Investment Committee ("NURIC") was established only in 2012 and was delegated fiduciary responsibility over the administration and investment of the Plans' assets, including: evaluating and reviewing vendor contractual service arrangements; selecting and monitoring the Plans' investment options; developing investment policies, objectives, and procedures for the Plans; and monitoring and controlling investment and administrative fees paid from the Plans to ensure those fees are reasonable for the services provided.

22.     Current members of NURIC are: Pamela S. Beemer, Ronald R. Braeutigam, Kathleen Hagerty, Craig A. Johnson, Candy Lee, William H. McLean, and Ingrid S. Stafford.

23.     NURIC and its individual members are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of their assets, and have discretionary authority or

6

discretionary responsibility in the administration of the Plan. 29 U.S.C.

§1002(21)(A)(i) and (ii).

24.     Because the Northwestern University entities or individual committee

members described above have acted as alleged herein as the agents of

Northwestern University, all defendants are collectively referred to hereafter as

"Defendants."

## FACTS APPLICABLE TO ALL COUNTS

### I.     Plan investments

25.     Under the terms of the Retirement Plan, participants are eligible to

contribute a discretionary amount of their annual compensation to the Plan and

Northwestern makes a matching contribution. Under the terms of the Voluntary

Savings Plan, participants may likewise contribute a discretionary amount of their

annual compensation to the Plan, but Northwestern makes no matching

contribution.

26.     Defendants exercise exclusive and discretionary authority and control

over the investment options that are included in the Plans.

27.     For both Plans, Defendants provided mutual funds and insurance

company variable annuity products as investment options.  The investment options

were and are offered by the Teachers Insurance and Annuity Association of America

and College Retirement Equities Fund ("TIAA-CREF") and the Fidelity

Management Trust Company ("Fidelity"). Defendants select investment options into

which participants' investments are directed, including those investment options

that are removed from the Retirement Plan and the Voluntary Savings Plan.

7

28.     As of December 31, 2015, Defendants offered a total of 242 investment options to Retirement Plan participants. In particular, the Retirement Plan offered 39 TIAA-CREF investments and 203 Fidelity investments (including both Fidelity funds and third-party funds offered through Fidelity). These investments included retail and institutional share class mutual funds, an insurance separate account, variable annuity options, and a fixed annuity option. The retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

29.     These investments are designated by Defendants as available investment alternatives offered under the Retirement Plan.

30.     As of December 31, 2015, Defendants offered a total of 187 investment options to Voluntary Savings Plan participants. In particular, the Voluntary Savings Plan offered 39 TIAA-CREF investments and 148 Fidelity investments (including both Fidelity funds and third-party funds offered through Fidelity). These investments included retail and institutional share class mutual funds, an insurance separate account, variable annuity options, and a fixed annuity option. The retail share class mutual funds are designed for small individual investors, not large retirement plans such as Northwestern's Plans. These retail share classes are identical in every respect to institutional share classes, except for much higher fees.

31.     These investments are designated by Defendants as available investment alternatives offered under the Voluntary Savings Plan.

8

32.    The TIAA Traditional Annuity offered in both Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

33.    The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their savings without penalty can only do so over ten years

34.    Both Plans include the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

9

35.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

      a.  "administrative expense" charge (24 bps);[2]

      b.  "distribution expense" charge (9.5 bps);

      c.  "mortality and expense risk" charge (0.5 bps); and

      d.  "investment advisory expense" charge (ranging from 4 to 12.5 bps).

36.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges consisted of the following:

      a.  "administrative expense" charge (26.5 bps);

      b.  "distribution expense" charge (8 bps);

      c.  "mortality and expense risk" charge (0.5 bps);

      d.  "liquidity guarantee" (18 bps); and

      e.  "investment management expense" charge (36.5 bps).

37.     The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also

---

[2] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

charge distribution, marketing, and other expenses, depending on the type of investment and share class.

38.     The Fidelity investment options offered to Plan participants are primarily mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

39.     Mutual funds have shareholders who are not participants in either Northwestern Plan, or any retirement plan, and who purchase shares as a result of the funds' marketing efforts. However, all shareholders in the mutual funds, including the participants in the Northwestern Plans, pay the expenses set forth in ¶¶35–386.

40.     As of December 31, 2015, of the Retirement Plan's $2.34 billion in net assets, TIAA-CREF funds accounted for nearly $1.8 billion and Fidelity funds accounted for nearly $548 million. As of December 31, 2014, of the Voluntary Savings Plan's $530 million in net assets, TIAA-CREF funds accounted for over $360 million and Fidelity funds accounted for over $160 million.

41.     In 2016, Defendants eliminated hundreds of mutual funds provided to Plan participants and selected a tiered structure comprised of a limited core set of 32 investment options.[3]

42.     Tier 1 consists of Blackrock target date mutual funds. Target date funds automatically rebalance their portfolios to become more conservative as the

---

[3] The Plans' target date funds are counted as a single investment option.

participant gets closer to retirement. The "target date" refers to the participant's expected retirement date, and is often part of the name for the fund. For instance, "2030" target date funds are designed for individuals who intend to retire in the year 2030.

43.    Tier 2 includes only five index funds comprising various asset classes and investment styles.

44.    Tier 3 includes 26 actively managed investment options, which include mutual funds, variable annuities, and an insurance separate account.

45.    Tier 4 consists of a self-directed brokerage window.

46.    Plan participants could invest in the options offered in Tiers 1–3 beginning July 27, 2016. Participants will not be able to invest in the Tier 4 self-directed brokerage window until September 16, 2016. Plan participants will be able to invest in options available under the previous structure until October 21, 2016.

## II.    Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable

47.    Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Retirement Plan and the Voluntary Savings Plan. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

48. To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

49. The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $75,000 account balance is the same for a participant with $7,500 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount that is based on the total number of participants in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

50. Jumbo and other large defined contribution plans, like the Retirement and Voluntary Savings Plans, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in a plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a large number of participants.

51. Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the

plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based fees, if prudent fiduciaries use revenue sharing (or asset-based charges) to pay for recordkeeping, they must monitor the total amount of revenue received by the recordkeeper to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue it receives that exceeds a reasonable recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can quickly result in excessive compensation. Funds that revenue share may use these payments as kickbacks to induce recordkeepers to use higher-cost share classes as plan investment options.

52.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

53.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to

participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[4]

54.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.
> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[5]

55.     The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[6]

56.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt, an independent investment consultant, similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

---

[4] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/
News_Center/Reports/130329-01exec.pdf.

[5] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[6] *Id.*

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[7]

57.    Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[8]

58.    Other industry literature makes the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall

---

[7] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[8] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[9] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[10]

59.     Use of a single recordkeeper is also less confusing to participants and results in their avoiding paying excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[11]

---

[9] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[10] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[11] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

60.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with two separate recordkeepers (TIAA-CREF and Fidelity) for the Retirement Plan and only consolidated the Voluntary Savings Plan to one recordkeeper (TIAA-CREF) in late 2012. There was no loyal or prudent reason that Defendants failed to engage in such process for the Voluntary Savings Plan long before both 2012 and 2009. In addition to the uncapped revenue sharing received as payment for these administrative services, the inefficient and costly structure of multiple recordkeepers has caused both Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services.

61.     The Retirement and the Voluntary Savings Plans' recordkeepers receive compensation for providing such services through per-participant fees and revenue sharing payments from the Plans' investments.

62.     Upon information and belief and industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments are set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

63. Upon information and belief, Fidelity was and/or is compensated for recordkeeping services based on internal revenue sharing it receives from using higher-cost share classes of Vanguard's mutual funds as opposed to the institutional classes readily available to jumbo plans such as the Plans.

64. In addition, TIAA-CREF and Vanguard also receive and/or received additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

65. Based on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the number of participants in the Plans combined (approximately 30,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plans would be approximately $1,050,000 in the aggregate for both Plans combined (or a flat fee based on $35 per participant). Even if Defendants had negotiated a reasonable recordkeeping fee for the Retirement and Voluntary Savings Plans separately, the Plans would have paid dramatically less for recordkeeping services.

66. Based on the direct and indirect compensation levels shown on the Retirement Plan's Form 5500s filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Retirement Plan paid between $3.3 and $4.1 million (or approximately $153 to $213 per participant) per year from 2010 to 2015, over 500% higher than a reasonable fee for

19

these services, resulting in millions of dollars in excessive recordkeeping fees each year.

67.    Based on the direct and indirect compensation levels shown on the Voluntary Savings Plan's Form 5500s filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Voluntary Savings Plan paid between $660 and $900 thousand (or approximately $54 to $87 per participant) per year from 2010 to 2015, over 149% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

68.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that just a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[12]

69.    Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plans' recordkeeping services. A competitive bidding process for recordkeeping services would have produced a reasonable recordkeeping fee. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, negotiate a reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

_____

[12] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

70. Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF and Fidelity. Therefore, Defendants caused the participants in both Plans to pay unreasonable expenses for administration. Had Defendants ensured that participants only paid reasonable fees for administrative and recordkeeping services, Retirement and Voluntary Savings Plan participants would not have lost almost $30 million of their retirement savings.[13]

## III. Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plans, including identical mutual funds in lower-cost share classes.

71. Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[14] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

---

[13] The Plans' losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments growing with the market.

[14] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

72.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

73.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

74.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund

22

is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

75.     Moreover, jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[15]

76.     Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-

---

[15] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

77.     Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Faculty and Voluntary Savings Plans. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

78.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that, for retirement plans of the Plans' size, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

79.     Despite these far lower-cost options, Defendants selected and continue to retain investment options in both the Retirement and Voluntary Savings Plans with far higher costs than were and are available to the Plans based on their size. Moreover, for the *exact same mutual fund option*, Defendants selected and continue to offer far higher-cost share classes of identical mutual funds than were available to the Plans.

24

80.     In the Retirement and Voluntary Savings Plans, lower-cost mutual

funds *identical* to the Plans' mutual funds include and have included the following:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Calvert New Vision Small Cap (A) (CNVAX) | 189 bps | Calvert New Vision Small Cap (I) (CVSMX) | 92 bps | 105.43% |
| Fidelity Large Cap Growth (FSLGX) | 80 bps | Fidelity Advisor Large Cap Growth (Inst) (FLNOX) | 68 bps | 17.65% |
| Fidelity Mid Cap Growth (FSMGX) | 67 bps | Fidelity Advisor Mid Cap Growth (Inst) (FGCOX) | 59 bps | 13.56% |
| Fidelity Spartan 500 Index (Inv) (FSMKX) | 10 bps | Fidelity Spartan 500 Index (Adv) (FSMAX) | 7 bps | 42.86% |
| Fidelity Stock Selector Small Cap (FDSCX ) | 75 bps | Fidelity Advisor Stock  Selector Small Cap (I) (FCDIX) | 62 bps | 20.97% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 47 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 22 bps | 113.64% |
| TIAA-CREF Lifecycle 2015 (Retire) (TCLIX) | 46 bps | TIAA-CREF Lifecycle 2015 (Inst) (TCNIX) | 42 bps | 9.52% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 45 bps | TIAA-CREF Lifecycle 2020 (Inst) (TCWIX) | 42 bps | 7.14% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 44 bps | TIAA-CREF Lifecycle 2025 (Inst) (TCYIX) | 42 bps | 4.76% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 44 bps | TIAA-CREF Lifecycle 2030 (Inst) (TCRIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 44 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 19 bps | 131.58% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 44 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 44 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 44 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Managed Allocation (Retire) (TITRX) | 71 bps | TIAA-CREF Managed Allocation (Inst) (TIMIX) | 46 bps | 54.35% |
| TIAA-CREF Small-Cap Blend Index (Retire) (TRBIX) | 35 bps | TIAA-CREF Small-Cap Blend Index (Inst) (TISBX) | 10 bps | 250.00% |
| TIAA-CREF Small-Cap Equity (Retire) (TRSEX) | 78 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 53 bps | 47.17% |
| TIAA-CREF Social Choice Equity (Retire) (TRSCX) | 47 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 22 bps | 113.64% |
| Vanguard Growth Index (Inv) (VIGRX) | 28 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 250.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 27 bps | Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | 237.50% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 49 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 37 bps | 32.43% |
| Vanguard Small Cap Index (Inv) (NAESX) | 28 bps | Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | 250.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 225.00% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 20 bps | 65.00% |
| Calvert Balanced Portfolio (A) (CSIFX) | 123 bps | Calvert Balanced Portfolio (I) (CBAIX) | 72 bps | 70.83% |
| Calvert Capital Accumulation (A) (CCAFX) | 176 bps | Calvert Capital Accumulation (I) (CCPIX) | 86 bps | 104.65% |
| Calvert International Equity (A) (CWVGX) | 180 bps | Calvert International Equity (I) (CWVIX) | 106 bps | 69.81% |
| Calvert Small Cap (A) (CCVAX) | 169 bps | Calvert Small Cap (I) (CSVIX) | 92 bps | 83.70% |
| Domini Social Equity (Inv) (DSEFX) | 123 bps | Domini Social Equity (Inst) (DIEQX) | 75 bps | 64.00% |
| Fidelity 500 Index (Inv) (FUSEX) | 10 bps | Fidelity 500 Index (Prem) (FUSVX) | 7 bps | 42.86% |
| Fidelity Balanced (FBALX) | 61 bps | Fidelity Balanced (K) (FBAKX) | 47 bps | 29.79% |
| Fidelity Blue Chip Growth (FBGRX) | 93 bps | Fidelity Blue Chip Growth (K) (FBGKX) | 74 bps | 25.68% |
| Fidelity Capital Appreciation (FDCAX) | 86 bps | Fidelity Capital Appreciation (K) (FCAKX) | 68 bps | 26.47% |
| Fidelity Contrafund (FCNTX) | 91 bps | Fidelity Contrafund (K) (FCNKX) | 78 bps | 16.67% |
| Fidelity Disciplined Equity (FDEQX) | 68 bps | Fidelity Disciplined Equity (K) (FDEKX) | 51 bps | 33.33% |
| Fidelity Diversified International (FDIVX ) | 96 bps | Fidelity Diversified International (K) (FDIKX) | 77 bps | 24.68% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Dividend Growth (FDGFX ) | 92 bps | Fidelity Dividend Growth (K) (FDGKX) | 71 bps | 29.58% |
| Fidelity Equity Income II (FEQTX) | 69 bps | Fidelity Equity Income II (K) (FETKX) | 54 bps | 27.78% |
| Fidelity Equity-Income (FEQIX) | 74 bps | Fidelity Equity-Income (K) (FEIKX) | 54 bps | 37.04% |
| Fidelity Export & Multinational (FEXPX) | 84 bps | Fidelity Export & Multinational K (FEXKX) | 64 bps | 31.25% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom K 2000 (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom K 2005 (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom K 2010 (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom K 2015 (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom K 2020 (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom K 2025 (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom K 2030 (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom K 2035 (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom K 2040 (FFKFX) | 62 bps | 30.65% |
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom K 2045 (FFKGX) | 62 bps | 32.26% |
| Fidelity Freedom 2050  (FFFHX) | 84 bps | Fidelity Freedom K 2050  (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom Income  (FFFAX) | 50 bps | Fidelity Freedom K Income  (FFKAX) | 42 bps | 19.05% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Fund (FFIDX) | 60 bps | Fidelity Fund (K) (FFDKX) | 43 bps | 39.53% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Global Commodity Stock (I) (FFGIX) | 107 bps | 1.87% |
| Fidelity Growth & Income (FGRIX) | 74 bps | Fidelity Growth & Income (K) (FGIKX) | 53 bps | 39.62% |
| Fidelity Growth Company (FDGRX) | 89 bps | Fidelity Growth Company (K) (FGCKX) | 72 bps | 23.61% |
| Fidelity Growth Discovery (FDSVX) | 75 bps | Fidelity Growth Discovery (K) (FGDKX) | 52 bps | 44.23% |
| Fidelity Growth Strategies (FDEGX) | 77 bps | Fidelity Growth Strategies (K) (FAGKX) | 51 bps | 50.98% |
| Fidelity Independence (FDFFX) | 92 bps | Fidelity Independence (K) (FDFKX) | 77 bps | 19.48% |
| Fidelity International Discovery (FIGRX) | 100 bps | Fidelity International Discovery (K) (FIDKX) | 79 bps | 26.58% |
| Fidelity International Index (Inv) (FSIIX) | 10 bps | Fidelity International Index (Prem) (FSIVX) | 7 bps | 42.86% |
| Fidelity International Small Cap (FISMX) | 142 bps | Fidelity International Small Cap (I) (FIXIX) | 131 bps | 8.40% |
| Fidelity International Small Cap Opportunities (FSCOX) | 89 bps | Fidelity International Small Cap Opportunities (I) (FOPIX) | 88 bps | 1.14% |
| Fidelity Leveraged Company Stock (FLVCX ) | 88 bps | Fidelity Leveraged Company Stock (K) (FLCKX) | 69 bps | 27.54% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Long-Term Treasury Bond Index (Inv) (FLBIX) | 20 bps | Fidelity Long-Term Treasury Bond Index (Prem) (FLBAX) | 10 bps | 100.00% |
| Fidelity Low-Priced Stock (FLPSX ) | 99 bps | Fidelity Low-Priced Stock (K) (FLPKX) | 85 bps | 16.47% |
| Fidelity Magellan (FMAGX) | 74 bps | Fidelity Magellan (K) (FMGKX) | 58 bps | 27.59% |
| Fidelity Mid-Cap Stock (FMCSX ) | 64 bps | Fidelity Mid-Cap Stock (K) (FKMCX) | 41 bps | 56.10% |
| Fidelity OTC (FOCPX) | 104 bps | Fidelity OTC (K) (FOCKX) | 88 bps | 18.18% |
| Fidelity Overseas (FOSFX) | 85 bps | Fidelity Overseas (K) (FOSKX) | 66 bps | 28.79% |
| Fidelity Puritan (FPURX) | 61 bps | Fidelity Puritan (K) (FPUKX) | 47 bps | 29.79% |
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Select Gold (I) (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Select Materials (I) (FMFEX) | 93 bps | 1.08% |
| Fidelity Short-Term Treasury Bond Index (Inv) (FSBIX) | 20 bps | Fidelity Short-Term Treasury Bond Index (Prem) (FSBAX) | 10 bps | 100.00% |
| Fidelity Stock Selector (FDSSX) | 86 bps | Fidelity Stock Selector (K) (FSSKX) | 66 bps | 30.30% |
| Fidelity Total Market Index (Inv) (FSTMX) | 10 bps | Fidelity Total Market Index (Prem) (FSTVX) | 7 bps | 42.86% |
| Fidelity Value (FDVLX) | 63 bps | Fidelity Value (K) (FVLKX) | 46 bps | 36.96% |
| Fidelity Value Discovery (FVDFX) | 95 bps | Fidelity Value Discovery (K) (FVDKX) | 74 bps | 28.38% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Value Strategies (FSLSX) | 80 bps | Fidelity Value Strategies (K) (FVSKX) | 56 bps | 42.86% |
| TIAA-CREF Equity Index (Retire) (TIQRX) | 33 bps | TIAA-CREF Equity Index (Inst) (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income (Retire) (TRGIX) | 73 bps | TIAA-CREF Growth & Income (Inst) (TIGRX) | 52 bps | 40.38% |
| TIAA-CREF High-Yield (Retire) (TIHRX) | 65 bps | TIAA-CREF High-Yield (Inst) (TIHYX) | 40 bps | 62.50% |
| TIAA-CREF International Equity (Retire) (TRERX) | 78 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Inst) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Growth (Retire) (TILRX) | 75 bps | TIAA-CREF Large-Cap Growth (Inst) (TILGX) | 50 bps | 50.00% |
| TIAA-CREF Large-Cap Growth Index (Retire) (TRIRX) | 34 bps | TIAA-CREF Large-Cap Growth Index (Inst) (TILIX) | 9 bps | 277.78% |
| TIAA-CREF Large-Cap Value (Retire) (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 49 bps | 51.02% |
| TIAA-CREF Large-Cap Value Index (Retire) (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index (Inst) (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Mid-Cap Growth (Retire) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 52 bps | 48.08% |
| TIAA-CREF Mid-Cap Value (Retire) (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value (Inst) (TIMVX) | 49 bps | 51.02% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Real Estate Securities (Retire) (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities (Inst) (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index (Retire) (TRSPX) | 33 bps | TIAA-CREF S&P 500 Index (Inst) (TISPX) | 8 bps | 312.50% |
| TIAA-CREF Short-Term Bond (Retire) (TISRX) | 55 bps | TIAA-CREF Short-Term Bond (Inst) (TISIX) | 30 bps | 83.33% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX ) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) (I) (FIEMX) | 119 bps | 5.04% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Japan (I) (FJPIX) | 75 bps | 6.67% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Real Estate Income (I) (FRIRX) | 89 bps | 3.37% |
| Vanguard Growth Index (Signal) (VIGSX) | 10 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 25.00% |
| Vanguard Mid Cap Index (Signal) (VMISX) | 14 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 133.33% |
| Vanguard Small Cap Index (Signal) (VSISX) | 10 bps | Vanguard Small Cap Index (Inst Pl) (VSCPX) | 6 bps | 66.67% |
| Vanguard Value Index (Signal) (VVISX) | 12 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 50.00% |
| Fidelity 500 Index (Inst) (FXSIX) | 5 bps | Fidelity 500 Index (Inst Prem) (FXAIX) | 3 bps | 66.67% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond (Inst) (FCNVX) | 30 bps | 33.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Emerging Markets Index (Prem) (FPMAX) | 22 bps | Fidelity Emerging Markets Index (Inst Prem) (FPADX) | 12 bps | 83.33% |
| Fidelity Extended Market Index (Prem) (FSEVX) | 7 bps | Fidelity Extended Market Index (Inst Prem) (FSMAX) | 6 bps | 16.67% |
| Fidelity Global ex-US Index (Prem) (FSGDX) | 18 bps | Fidelity Global ex-US Index (Inst Prem) (FSGGX) | 10 bps | 80.00% |
| Fidelity International Index (Prem) (FSIVX) | 7 bps | Fidelity International Index (Inst Prem) (FSPSX) | 6 bps | 16.67% |
| Fidelity Mid Cap Index (Prem) (FSCKX) | 12 bps | Fidelity Mid Cap Index (Inst Prem) (FSMDX) | 6 bps | 100.00% |
| Fidelity Small Cap Index (Prem) (FSSVX) | 17 bps | Fidelity Small Cap Index (Inst Prem) (FSSNX) | 11 bps | 54.55% |
| Fidelity Total Market Index (Prem) (FSTVX) | 7 bps | Fidelity Total Market Index (Inst Prem) (FSKAX) | 5 bps | 40.00% |
| Fidelity U.S. Bond Index (Prem) (FSITX) | 12 bps | Fidelity U.S. Bond Index (Inst Prem) (FXNAX) | 5 bps | 140.00% |
| Fidelity China Region (FHKCX) | 98 bps | Fidelity Advisor China Region I (FHKIX) | 93 bps | 5.38% |
| Fidelity Inflation-Protected Index (Prem) (FSIYX) | 10 bps | Fidelity Inflation-Protected Index (Inst Prem) (FIPDX) | 5 bps | 100.00% |
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate (I) (FIRIX) | 109 bps | 4.59% |
| Fidelity Latin America (FLATX) | 103 bps | Fidelity Latin America (I) (FLFIX) | 101 bps | 1.98% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Real Estate Index (Prem) (FSRVX) | 9 bps | Fidelity Real Estate Index (Inst) (FSRNX) | 7 bps | 28.57% |
| Strategic Advisers Core Multi-Manager (FLAUX) | 96 bps | Strategic Advisers Core Multi-Manager (F) (FHJSX) | 86 bps | 11.63% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager (F) (FMBKX) | 107 bps | 8.41% |
| Strategic Advisers Value Multi-Manager (FKMOX) | 97 bps | Strategic Advisers Value Multi-Manager (F) (FGWBX) | 87 bps | 11.49% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth (Z) (FZAJX) | 88 bps | 18.18% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock (Z) (FZALX) | 54 bps | 25.93% |
| Strategic Advisers Small Mid Cap Multi-Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi-Manager (F) (FARMX) | 105 bps | 10.48% |
| Vanguard Growth Index (Adm) (VIGAX) | 9 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 12.50% |
| Vanguard Mid Cap Index (Adm) (VIMAX) | 9 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 50.00% |
| Vanguard Small Cap Index (Adm) (VSMAX) | 9 bps | Vanguard Small Cap Index (Inst Pl) (VSCPX) | 6 bps | 50.00% |
| Vanguard Value Index (Adm) (VVIAX) | 9 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 12.50% |
| Fidelity Emerging Markets Discovery (FEDDX) | 144 bps | Fidelity Emerging Markets Discovery (I) (FEDIX) | 143 bps | 0.70% |

34

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Europe (FIEUX) | 101 bps | Fidelity Europe (I) (FHJMX) | 96 bps | 5.21% |
| Fidelity Total Bond (FTBFX) | 45 bps | Fidelity Total Bond (Z) (FBKWX) | 36 bps | 25.00% |

81.     These lower-cost share classes of the identical mutual funds for the Retirement Plan and Voluntary Savings Plan have been available for years, some dating back to the early 2000's or before.

82.     The failure to select far lower-cost share classes for the Plans' mutual fund options that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost, demonstrates that Defendants failed to consider the size and purchasing power of the Plans when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of those mutual funds.

83.     Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options, the Plans' participants would not have lost millions of dollars of their retirement savings.

**IV.     Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to pay lower fees and confusing participants.**

84.     Defendants provided a dizzying array of duplicative funds in the same investment style, thereby losing the bargaining power associated with offering a

35

single option in each investment style, which significantly reduces investment fees, and causing "decision paralysis" for participants. For the Retirement and Voluntary Savings Plans, Defendants placed over 240 and 180 investment options, respectively, in the core lineup for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and fixed guaranteed annuity.

85.     In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[16] This reasonable number of options provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

86.     A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

87.     Prudent fiduciaries of large defined contribution plans engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with the ability to

---

[16] Available at https://www.callan.com/research/files/990.pdf.

diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

88.     Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. Unlike Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are made plan options, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

89.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[17]

90.     Moreover, having many actively managed funds in the Plans within the same investment style results in the Plans effectively having an index fund return, while paying much higher fees for active management than the fees of a

---

[17] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

passive index fund, which has much lower fees because there is no need for active management and its higher fees.

91.     From 2010 to date, the Retirement Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (16 options), fixed income and high yield bond (32 options), specialty/focused (41 options), international (36 options), large cap domestic equities (48 options), mid cap domestic equities (15 options), small cap domestic equities (12 options), real estate (2 options), money market (9 options), and target date investments (2 fund families). The Voluntary Savings Plan included and continues to include duplicative investments in balanced/asset allocation (16 options), fixed income and high yield bond (32 options), specialty/focused (41 options), international (35 options), large cap domestic equities (48 options), mid cap domestic equities (15 options), small cap domestic equities (11 options), real estate (6 options), and money market (9 options), and target date investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and leads to "decision paralysis".

92.     For illustration purposes, Defendants included 14 large cap domestic blend investments for both the Retirement Plan and Voluntary Savings Plan as of December 31, 2015. These investments are summarized below and compared to a far lower-cost alternative: the Vanguard Institutional Index Fund (Instl Plus).  The

Vanguard Institutional Index Fund (Instl Plus) (VIIIX), by definition, mirrors the market, and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Total Assets | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $527,984,153 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $52,667,490 | 37 bps | 2 bps | 1750% |
| TIAA-CREF Equity Index (INST) (TIEIX) | $12,606,572 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index (INST) (TISPX) | $25,385,799 | 6 bps | 2 bps | 200% |
| Fidelity Domini Social Equity (INV) (DSEFX) | $949,081 | 116 bps | 2 bps | 5700% |
| Fidelity Disciplined Equity (K) (FDEKX) | $2,251,402 | 79 bps | 2 bps | 3850% |
| Fidelity Dividend Growth (K) (FDGKX) | $4,097,254 | 57 bps | 2 bps | 2750% |
| Fidelity Growth & Income (K) (FGIKX) | $6,419,109 | 52 bps | 2 bps | 2650% |
| Fidelity Large Cap Core Enhanced Index (FLCEX) | $365,500 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock (FLCSX) | $1,392,162 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock (FGRTX) | $738,905 | 67 bps | 2 bps | 3250% |
| Fidelity Spartan 500 Index (INST) (FXSIX) | $38,057,710 | 4 bps | 2 bps | 100% |
| Fidelity Spartan Total Market Index (ADV) (FSTVX) | $16,697,483 | 5 bps | 2 bps | 150% |
| Strategic Advisers Core Multi-Manager (FLAUX) | $23,547 | 97 bps | 2 bps | 4750% |
| **Total of Higher-Cost Alternatives** | ***$689,636,167*** | | | |

93.    With over *$580 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps.



94.    Many other large cap index funds are also available at far lower costs than the Plans' large cap blend funds. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Instl Plus), Plan participants would have avoided losing well in excess of $2.6 million dollars in fees for 2015 alone, and many more millions since 2010.

95.    In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to generate investment

returns in excess of its benchmark, passively managed index funds hold all or a representative sample of securities in a specific index, such as the S&P 500 index. The passively managed index funds have no need for stock selection because the sole investment strategy of an index fund is to mimic the index. The investment strategy of an index fund is to track the performance of a specific market benchmark net of fees. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

96.     For example, in the large cap blend investment style, Defendants provided four separate index funds in each Plan that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection. As another example, Defendants retained five separate index funds for the fixed income and intermediate-term bond investment style.

97.     Since index funds merely hold the same securities in the same proportions as the index,[18] having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

---

[18] Another example of an index is the Dow Jones Industrial Average.

41

98.     Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

99.     Overall, Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, which caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

## V.     Defendants imprudently retained historically underperforming Plan investments.

100.     Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments, numerous investment options historically underperformed for years lower-cost alternatives that were available to the Plans.

### A.     Defendants imprudently retained the CREF Stock Account.

101.     The CREF Stock Account is one of the largest, by asset size, investment options in the Plans with nearly $528 million in total assets, and has been offered to participants throughout the period from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years, and continues to underperform

its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

102.    TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

103.    As generally understood in the investment community, passively managed investment options should be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth in paragraphs ¶¶70–73. This extreme unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike smaller stocks, which are not covered by many analysts leading to potential inefficiencies in pricing.

43

104.    The efficiencies of the large cap market hinder an active manager's

ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief
> that securities markets are remarkably efficient. Most investors would be
> considerably better off by purchasing a low expense index fund, than by
> trying to select an active fund manager who appears to possess a "hot hand."
> Since active management generally fails to provide excess returns and tends
> to generate greater tax burdens for investors, the advantage of passive
> management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50

J. FIN. 549, 571 (1995).[19]

105.    Academic literature overwhelmingly concludes that active managers

consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for
> passive investing. Dozens of studies have examined the performance of
> mutual funds and other professional-managed assets, and virtually all of
> them have concluded that, on average, active managers underperform
> passive benchmarks…The median active fund underperformed the passive
> index in 12 out of 18 years [for the large-cap fund universe]…The bottom line
> is that, over most periods, the majority of mutual fund investors would have
> been better off investing in an S&P 500 Index fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap
> domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed.,1998).

106.    Prudent fiduciaries of large defined contribution plans must conduct

an analysis to determine whether actively managed funds, particularly large cap,

will outperform their benchmark net of fees. Prudent fiduciaries then make a

---

[19] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

107.    Defendants failed to undertake such analysis when it selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. Defendants also selected and retained that fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers net of fees in this investment style.

108.    Had such an analysis been conducted by Defendants, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

109.    Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style and its benchmark for the one-, five-, and ten-year

periods ending December 31, 2014. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



110.   The CREF Stock Account, with an expense ratio of 69 bps as of December 31, 2015, was and is dramatically more expensive than far better

performing index alternatives: the Vanguard Total Stock Market Index Fund (Instl Plus) (2 bps) and the Vanguard Institutional Index (Instl Plus) (2 bps).

111.   Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), Vanguard PRIMECAP (Adm) (VPMAX), and Vanguard Capital Opp. (Adm) (VHCAX).



112.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[20]



---

[20] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.





113. Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 69 bps as of December 31, 2015, was far more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

114. Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. AonHewitt, *TIAA-CREF Asset Management*, InBRIEF, at 3 (July 2012).[21] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5.

115. The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its

---

[21] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

continuing to underperform lower-cost investment alternatives that were readily available to the Plans.

116.  Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

117.  Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively or passively managed lower-cost alternatives identified in ¶¶109 and 111, participants in the Plans would not have lost in excess of $140 million of their retirement savings from the fund being retained in the Plans.[22]

## B. Defendants imprudently retained the TIAA Real Estate Account.

118.  Defendants selected and continue to include the TIAA Real Estate Account as one of the real estate investment options in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Instl) (VGSNX).

---

[22] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

119. With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Instl) with an expense ratio of 8 bps.



120. The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[23] Despite this, Defendants selected and to this date retained it in the Plans.

---

[23] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Instl) was 5.49%.







121.   This underperformance continued for years before 2009 and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index (Instl) over the five- and ten-year periods ending December 31, 2014.



122. As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as an investment option in the Plans, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

123. Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index (Instl), Plan participants would not have lost millions of dollars of their retirement savings.[24]

## VI. Defendants have admitted that the prior structure of the Plans was imprudent and caused unreasonable fees to be charged to the Plans.

124. Defendants expressly recognized that the Plans' multiple recordkeeper structure caused participants to pay unreasonable recordkeeping fees. In an April 4, 2016 letter to the Plans' participants, Defendants explained that Northwestern had "negotiated a credit of fees, called a 'revenue credit,' from both Fidelity and TIAA."[25]

125. A "revenue credit" is a rebate to retirement plan participants to compensate them for overpayments made to plan service providers—in this case, the recordkeepers.

126. The revenue credit Northwestern negotiated with Fidelity and TIAA-CREF is "based on the proportion of [each Plan participant's] aggregate Northwestern University retirement account balance ... as of March 31, 2016."[26] Thus, the Plans' participants would only receive the revenue credit for improper overcharges after March 31, 2016, and not for overcharges paid prior to that date.

---

[24] Losses in the Plans have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Instl) to compensate participants who have not been reimbursed for their losses.

[25] April 4, 2016 letter from Pamela S. Beemer, available at http://www.northwestern.edu/hr/benefits/retirement-plans/2016-Revenue-Credit-Letter.pdf.

[26] *Id.*

In other words, Defendants recognized that the Plans' participants had been overcharged by TIAA-CREF and Fidelity for recordkeeping services, but did nothing to recoup losses already suffered.

127.    Defendants likewise recognized that prior structure of the Plans—with *hundreds* of overlapping, duplicative, and costly investment options—caused participants to pay unreasonable investment fees.

128.    In a June 2016 letter to the Plans' participants, Defendants acknowledged that the new tiered structure was "designed to be simpler and **allow for informed decisions** to be made based upon an individual's personal investment comfort level and expertise," and **enable simpler decision-making**."[27]

129.    In an August 2016 "town hall" meeting presentation, Defendants explained that the new tiered structure would: "**[r]educe[] administration fees**," which would in turn "**increase[] participant returns**;" offer a "[s]treamlined menu for all investor types;" and provide "[a]ccess to **lower cost share classes** when available."[28]

130.    Defendants acknowledged that restructuring the Plans' investment options "**[b]etter aligns us with peers as many have reduced their line-ups, or are in [the] process of doing so**."[29]

---

[27] June 2016 letter from Pamela S. Beemer, available at http://www.northwestern.edu/hr/benefits/retirement-plans/2016%20Investment%20Change.pdf.

[28] "What You Need to Know: Changes to the Northwestern University Retirement Plans," available at http://www.northwestern.edu/hr/benefits/retirement-plans/Town%20Hall%20Meetings%20Presentation_Aug2016.pdf.

[29] *Id.*

131. Defendants also admitted that the recent shift in the Plans' structures "[p]ositions NURIC to **meet expanded fiduciary responsibilities** based on IRS regulations which now **mandate greater oversight by employers**."[30]

132. Had Defendants used the massive bargaining power afforded them by the Plans' vast assets to obtain revenue credits, reduce administration fees, and obtain lower cost share classes at least by 2009, the Plans' participants would have avoided paying millions of dollars in unreasonable investment and administrative fees, and millions of dollars in performance losses.

133. In restructuring of the Plans' investment options, Defendants removed literally hundreds of unnecessary mutual funds from the Plans. However, they left both the CREF Stock Fund and the TIAA Real Estate Fund as investment options, despite their poor performance history as detailed in ¶¶108–123.

## ERISA'S FIDUCIARY STANDARDS

134. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)  for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan; [and]

---

[30] *Id.*

(B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

135.   Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

136.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

137.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific

59

> responsibilities which give rise to his status as a
> fiduciary, he has enabled such other fiduciary to
> commit a breach; or
>
> (3)  if he has knowledge of a breach by such other
>      fiduciary, unless he makes reasonable efforts under
>      the circumstances to remedy the breach.

138.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil

action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be personally
> liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits of
> such fiduciary which have been made through use of assets
> of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

139.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the

Plans to bring an action individually on behalf of the Plans to enforce a breaching

fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

140.   In acting in this representative capacity and to enhance the due

process protections of unnamed participants and beneficiaries of the Plans, as an

alternative to direct individual actions on behalf of the Plans under 29 U.S.C.

§1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of

all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan from August 17, 2010, through the date of judgment, excluding the Defendant and any participant who is a fiduciary to the Plans.

141. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

    a.    The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

    b.    There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

    c.    Plaintiffs' claims are typical of the claims of the Class because the Plaintiffs were participants during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

142.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, it would be impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact

predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

143.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field". *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS

184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable

defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper*

*Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

      b.    The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of
> hours for the benefit of employees and retirees. No case had
> previously been brought by either the Department of Labor or
> private attorneys against large employers for excessive fees in a
> 401(k) plan. Class Counsel performed substantial work[,]
> investigating the facts, examining documents, and consulting
> and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the
> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

      c.    Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in

ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS

157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court

again awarded Plaintiffs' attorney's fees, emphasizing the significant

contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and federal courts about the importance

of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution
> made by the Plaintiffs whose litigation clarified ERISA
> standards in the context of investment fees. The litigation
> educated plan administrators, the Department of Labor, the
> courts and retirement plan participants about the importance of
> monitoring recordkeeping fees and separating a fiduciary's
> corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.*, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9,

2015).

      d.     Schlichter, Bogard & Denton is also class counsel in and handled

*Tibble v. Edison Int'l*,  in which the Supreme Court held in a unanimous 9–0

decision that ERISA fiduciaries have "a continuing duty to monitor

investments and remove imprudent ones[.]" Schlichter, Bogard & Denton

successfully petitioned for a writ of certiorari, and obtained amicus support

from the United States Solicitor General and AARP, among others. Given the

Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision

will affect all ERISA defined contribution plans.

      e.     The firm's work in ERISA excessive fee class actions has been

featured in the New York Times, Wall Street Journal, NPR, Reuters, and

Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees,*

*Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[31] Gretchen

Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[32] Liz

Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

2015);[33] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y.

TIMES (Oct. 16, 2014);[34] Sara Randazzo, *Plaintiffs' Lawyer Takes on*

*Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[35] Jess Bravin and Liz Moyer,

*High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J.

(May 18, 2015); [36] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on*

*Trial*, NPR (Dec. 15, 2014);[37] Mark Miller*, Are 401(k) Fees Too High? The*

*High-Court May Have an Opinion*, REUTERS (May 1, 2014);[38] Greg Stohr,

*401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct.

2, 2014).[39]

---

[31] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[32] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[33] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[34] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[35] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[36] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[37] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[38] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[39] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

## COUNT I

### Breach of Duties of Loyalty and Prudence
### Unreasonable Administrative Fees

144.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

145.    The scope of the fiduciary duties and responsibilities of Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

146.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey*, 746 F.3d at 336.

147.    Defendants failed to engage in a prudent and loyal process for selecting a recordkeeper. Rather than consolidating the Plans' administrative and recordkeeping services under a single service provider, Defendants retained two recordkeepers to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a

lower cost with a single recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

148.    Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plans' recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plans. As the amount of assets grew, the revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

149.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

150.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of Duties of Loyalty and Prudence
### Unreasonable Investment Management Fees and Performance Losses

151.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

152.   The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plans for the sole and exclusive benefit of participants and beneficiaries of the Plans, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

153.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

154.   Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

155.   Rather than consolidating the Plans' over 70 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant

69

confusion. In addition, Defendants, as the fiduciaries charged with operating as a prudent financial expert, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. Therefore, Defendants breached their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

156. The same conduct by Defendants shows a failure to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like

70

character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

157.    Defendants failed to engage in a prudent process for the selection and retention of investment options for the Plans. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plans.

158.    CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

159.    TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

160.    Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

161.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

71

162.     Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

### Failure to Monitor Fiduciaries

163.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

164.     Defendants have the responsibility to control and manage the operation and administration of the Plans, including the selection of service providers for the Plans, with all powers necessary to enable it to properly carry out such responsibilities.

165.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

166.     To the extent any of the Defendants' fiduciary responsibilities were delegated to another fiduciary, their monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

167.     Defendants breached their fiduciary monitoring duties by, among other things:

a.     Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by

72

as the Plans suffered enormous losses as a result of their appointees'
imprudent actions and omissions with respect to the Plans;

b.       Failing to monitor their appointees' fiduciary process, which
would have alerted any prudent fiduciary to the potential breach because of
the excessive administrative and investment management fees and
consistent underperforming Plan investments in violation of ERISA;

c.       Failing to ensure that the monitored fiduciaries had a prudent
process in place for evaluating the Plans' administrative fees and ensuring
that the fees were competitive, including a process to identify and determine
the amount of all sources of compensation to the Plans' recordkeepers and the
amount of any revenue sharing payments; a process to prevent the
recordkeepers from receiving revenue sharing that would increase the
recordkeepers' compensation to unreasonable levels even though the services
provided remained the same; and a process to periodically obtain competitive
bids to determine the market rate for the services provided to the Plans;

d.       Failing to ensure that the monitored fiduciaries considered the
ready availability of comparable and better performing investment options
that charged significantly lower fees and expenses than the Plans'
investments; and

e.       Failing to remove appointees whose performance was
inadequate in that they continued to maintain imprudent, excessively costly,
and poorly performing investments, all to the detriment of Plan participants'

73

retirement savings.

168.   Had Defendants discharged their fiduciary monitoring duties prudently as described above, the Plans would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, the Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

169.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

- Determine the method by which losses to the Plans under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

74

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plans to include only prudent investments;

- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class, appoint the Plaintiffs as a class representatives, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

August 17, 2016

Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON LLP
Jerome J. Schlichter, No. 2488116
Troy A. Doles, No. 6242803
Heather Lea, No. 6276614
Sean E. Soyars, MO No. 57317
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com