**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA L. DIVANE, | ) | |
| APRIL HUGHES, SUSAN BONA, | ) | |
| KATHERINE D. LANCASTER, and | ) | |
| JASMINE WALKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 16 C 8157 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| NORTHWESTERN UNIVERSITY, | ) | |
| NORTHWESTERN UNIVERSITY | ) | |
| RETIREMENT INVESTMENT | ) | |
| COMMITTEE, PAMELA S. BEEMER, | ) | |
| RONALD R. BRAEUTIGAM, | ) | |
| KATHLEEN HAGERTY, CRAIG A. | ) | |
| JOHNSON, CANDY LEE, WILLIAM H. | ) | |
| McLEAN, INGRID S. STAFFORD, | ) | |
| NIMALAN CHINNIAH, and | ) | |
| EUGENE S. SUNSHINE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Laura L. Divane ("Divane"), April Hughes ("Hughes"), Susan Bona ("Bona"),

Katherine Lancaster ("Lancaster") and Jasmine Walker ("Walker") filed suit seeking relief under

the Employee Retirement Income Security Act ("ERISA"). In plaintiffs' amended complaint

[38], plaintiffs assert six counts for breach of fiduciary duty (Counts I-VI) and one count for

failure to monitor fiduciaries (Count VII). Defendants have filed a motion to dismiss the

amended complaint [58]. In addition, plaintiffs seek leave to file a second-amended complaint

[129], which includes the same six counts for breach of fiduciary duty and the claim for failure to

monitor fiduciaries (Count XI of the proposed second amended complaint). Plaintiffs would like

to add four counts for breach of fiduciary duty and to drop one plaintiff (Bona). Plaintiffs have also moved to file the proposed second amended complaint under seal.

For the reasons set forth below, the Court grants defendants' motion to dismiss [58]. The Court denies the motion for leave to file under seal [133]. The Court denies plaintiffs' motion for leave to amend [129]. All other pending motions are denied as moot.

## I.     BACKGROUND

Two ERISA defined-contribution plans are at issue in this case. The first plan is the Northwestern University Retirement Plan (the "Retirement Plan"), in which all plaintiffs participate. Under the Retirement Plan, participating employees can contribute a portion of their compensation to their account within the Plan, and Northwestern makes a matching contribution. (Am. Complt. ¶ 112). The second plan is the Northwestern University Voluntary Savings Plan (the "Voluntary Plan"), in which three plaintiffs (Hughes, Lancaster and Walker) participate. Under the Voluntary Plan, participating employees can contribute a portion of their compensation to their account within the Plan, but Northwestern does not make a matching contribution. (Am. Complt. ¶ 112).

Both the Retirement Plan and the Voluntary Plan are 403(b) plans that allow contributions to grow tax-free until withdrawn (preferably in retirement). Originally, 403(b) plans allowed investment only in insurance company annuity contracts, but now 403(b) plans can offer investments in mutual funds. (Am. Complt. ¶ 76). Both plans allow each participant to choose the investments into which the money in his or her account is invested. (Am. Complt. ¶ 18, 42). Participants can choose among the options assembled by the plans' fiduciaries. (Am Complt. ¶ 42).

2

Defendant Northwestern University ("Northwestern") is the plan administrator for both plans. (Am. Complt. ¶ 25). Plaintiffs allege that Northwestern is a fiduciary by virtue of its discretionary control of the plans. (Am. Complt. ¶ 26). Plaintiffs allege that Northwestern delegated its fiduciary responsibility to its Executive Vice President, a position which has been held by defendant Nimalam Chinniah ("Chinniah") since September 8, 2014 and was held by defendant Eugene Sunshine ("Sunshine") before that. (Am. Complt.¶¶ 28-29). Plaintiffs allege that, as of February 28, 2012, Northwestern established the Northwestern University Retirement Investment Committee (the "Investment Committee") and granted it discretionary authority to manage the assets of the plans. The Investment Committee is made up of defendants Ronald R. Braeutigam, Kathleen Hagerty, Craig A. Johnson, Candy Lee, William H. McLean and Ingrid S. Stafford. (Am. Complt. ¶¶ 31-33).

Plaintiffs' amended complaint is massive: 287 paragraphs over 141 pages. Plaintiffs' proposed second amended complaint (which is nearly identical, except it adds allegations for four new counts and a few additional allegations as to the original counts) is 376 paragraphs over 165 pages. Most of plaintiffs' allegations, though, are not specific to the defendants and the plans in this case. Instead, most of plaintiffs' allegations constitute a description of plaintiffs' opinions both on ERISA law and on a proper long-term investment strategy for average people who lack the time to select either individual stocks or actively-managed mutual funds.

In their complaint, plaintiffs object to, among other things, the mix of investment options available in the plans. Plaintiffs believe they had too many options, leaving them with the "virtually impossible burden" of deciding where to invest their money. (Am. Complt. 167).

In the amended complaint, plaintiffs describe two line-ups of investment options they could choose from under the plans: the options available for some (unspecified) period of time before October 2016 and the options available during and after October 2016.

### Investment options before October 2016

Before 2016, the plans offered investments through TIAA-CREF (Teachers Insurance and Annuity Association of America and College Retirement Equities Fund) and Fidelity Management Trust Company ("Fidelity"). The Retirement Plan offered 240 investment options (39 through TIAA-CREF and 203 through Fidelity) while the Voluntary Plan offered 180 (39 through TIAA-CREF and 148 through Fidelity). (Am. Complt. ¶¶112-113). Among the investment options were mutual funds and insurance company annuities (both fixed and variable). (Am. Complt. ¶ 110).

One of the TIAA-CREF investments offered under the plans is the TIAA-CREF Traditional Annuity, a fixed annuity contract that returns a guaranteed, contractually-specified minimum interest rate. (Am. Complt. ¶ 117). The TIAA-CREF Traditional Annuity has "severe restrictions and penalties for withdrawal," including a 2.5% surrender charge if a participant withdraws the investment in a lump sum sooner than 120 days after the termination of his/her employment. (Am. Complt. ¶¶ 117, 132).

TIAA-CREF's policy was (and apparently still is) to require any plan offering its TIAA-CREF Traditional Annuity: (1) to offer its CREF Stock Account; and (2) to use TIAA as recordkeeper for *its* products. (Am. Complt. ¶ 130). Plaintiffs are not fond of the CREF Stock Account. (Of course, under the plans, they could choose their investments and did not have to choose the CREF Stock Account merely because it was offered.) Plaintiffs allege that the CREF

Stock Account fund charged excessive fees. (Am. Complt. ¶ 135). (More on plaintiffs' complaints about the CREF Stock Account later.)

**Investment options available by October 2016**

In 2016, defendants changed the line-up of investment options. (Am. Complt. ¶¶ 123-128). Beginning in July 2016, participants could invest in one of three tiers of options: Tier 1 consists of target-date mutual funds (i.e., funds that automatically rebalance their portfolios to become more conservative as the funds reach their target dates); Tier 2 consists of five index funds; and Tier 3 consists of 26 actively-managed funds. (Am. Complt. ¶¶ 124-126, 128). Beginning in September 2016, the plans also offered Tier 4, which allows a participant to invest his or her plan assets via a full-service brokerage window. (Am. Complt. ¶¶ 127-128). The participants had to be out of the old options (the ones that did not carry over, anyway) by October 21, 2016.[1] (Am. Complt. ¶ 128).

**Fees**

Among the investment options in the plans both before and after October 2016 were mutual funds, each of which covers its expenses (including profit) by charging fees in the form of an expense ratio. (Am. Complt. ¶¶ 54, 120, 121). The expense ratio is the percentage of fund assets the fund keeps each year. All other things being equal, a lower expense ratio is better. An illustration: if a fund has a 4% return in a year but charges a 2% expense ratio, then half the return is eaten in expenses, and the investor keeps half of the return. If the same fund has a 1% expense ratio and the same return, then a quarter of the return is eaten in expenses, and the investor keeps 75% of the return. If the fund, instead, has an expense ratio of .1%, then only 2.5% of the return is eaten by expenses, and the investor keeps 97.5% of the return. Over time

---

[1] Plaintiffs do not allege that the structure or timing of the transition violated fiduciary duties.

with compound returns, all else being equal, the difference in expense ratios makes a huge difference in an investor's savings at retirement. Of course, all things are not equal between funds. In practice, the funds with the lowest expense ratios are the ones with the least to do in terms of selecting stocks: index funds. Index funds hold a pre-selected (usually by someone else, like the S&P 500) set of stocks, which minimizes not only trading costs but also eliminates the need to pay someone to select the stocks. Actively-managed funds have to pay someone to select the stocks, and the cost of paying the investment managers drives up expenses (though not necessarily returns: it is hard, it turns out, to beat the market). Index funds tend to be less liquid, because they tend to have features that discourage turnover. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011) ("an index fund typically disallows new investments for a month or more following any withdrawal").

Among the expenses included in a fund's expense ratio are costs for recordkeeping. Defined contribution plans need to have a record keeper to track the amount of each participant's account and how the account is allocated among investment options. (Am. Complt. ¶ 48). Record keepers also maintain websites for plan participants and sometimes provide investment advice or education materials. (Am. Complt. ¶ 48). The fund that collects the expense ratio is not necessarily the entity that handles the recordkeeping. One way for plans to pay for recordkeeping is to have the fund that collects the expense ratio share part of the expense ratio with the record keeper. (Am. Complt. ¶¶ 60-61). That is how fees are (and were) paid in these plans. (Am. Complt. ¶¶ 144-146).

Plaintiffs allege that, alternatively, plans can pay directly for recordkeeping by paying a "flat annual fee based on the number of participants" in the plan. (Am. Complt. ¶ 61). Plaintiffs allege that a reasonable fee for recordkeeping is $35/participant/year. (Am. Complt. ¶ 148).

Plaintiffs allege that participants in the Northwestern plans paid more. Plaintiffs allege that, between 2010 and 2015, participants in the Voluntary Plan paid an average of between $54 and $87 per participant per year (Am. Complt. ¶ 150) and that participants in the Retirement Plan paid an average of between $153 and $213 per participant per year (Am. Complt. ¶ 149). Plaintiffs' allege that in 2015 the Voluntary Plan held $530 million in net assets and had 12,293 participants. (Am. Complt. ¶ 16). Plaintiffs' allege that in 2015 the Retirement Plan held $2.34 billion in net assets and had 21,622 participants. (Am. Complt. ¶ 12). Plaintiffs seem to recognize that a per capita charge (instead of an expense ratio) tends to discourage and punish small investors, because plaintiffs allege that a per capita fee can, once calculated, be divided by the plans among the participants based on the amount each participant has invested. (Am. Complt. ¶ 64).

Plaintiffs allege that the record keeping expense for plans generally can be higher if plans use multiple record keepers. (Am. Complt. ¶ 142). As to the plans in this case, plaintiffs allege that the Retirement Plan has two record keepers (TIAA-CREF and Fidelity) and that the Voluntary Plan has had one record keeper (TIAA-CREF) since 2012. (Am. Complt. ¶ 143). Plaintiffs allege that TIAA-CREF and Fidelity are paid for record-keeping via expense ratios. (Am. Complt. ¶¶ 144-146). Specifically, plaintiffs allege that the Fidelity funds in the plans charge retail rate expense ratios in order to cover record-keeping, rather than institutional-rate expense ratios. (Am. Complt. ¶¶ 146).

The charging of higher retail expense ratios instead of institutional-rate expense ratios is also a major theme in plaintiffs' complaint. Plaintiffs worry that the entities which provide services to the plans have a profit motive. (Am. Complt. ¶ 46, 50). Plaintiffs believe that large plans have sufficient bargaining power to obtain lower expense ratios on funds. (Am. Complt. ¶

7

45, 164). Plaintiffs include in their complaint a ten-page list of the funds available to plan participants, as well as the retail expense ratios the plan participants are charged. (Am. Complt. ¶ 161). The list also includes the expense ratios charged by the same mutual funds to institutional investors. (Am. Complt. ¶ 161). Five funds (Fidelity Spartan 500 Index, Fidelity 500 Index, Fidelity International Index, Fidelity Total Market Index and Vanguard Small Cap Index) available to participants of the plans charged expense ratios of .1%, even though institutional investors could get those funds for an expense ratio of .07%. (Am. Complt. ¶ 161). Other spreads were different. (Am. Complt. ¶ 161). Plan participants could invest in the Fidelity Emerging Europe, Middle East, Africa Fund at an expense ratio of 1.25%, while institutional investors paid 1.19% for that fund. (Am. Complt. ¶ 161). The expense ratios of all funds available to plan participants ranged from .05% (Fidelity 500 Index (Inst) (FXSIX)) to 1.89% (Calvert New Vision Small Cap (A)(CNVAX)). (Am. Complt. ¶ 161).

In April 2016, defendants informed plan participants that they had "negotiated a credit of fees" from both Fidelity and TIAA-CREF. (Am. Complt. ¶ 216).

Fees are one reason, as noted above, plaintiffs object to the inclusion of the CREF Stock Account as an investment option in the plans. While plan participants could invest in the TIAA-CREF Equity Index for an expense ratio of .05% or the TIAA-CREF S&P 500 Index for an expense ratio of .06%, the CREF Stock Account charged an expense ratio of .46%. (Am. Complt. ¶ 176). The CREF Stock Account paid TIAA-CREF about half of the expense ratio for record keeping. (Am. Complt. ¶ 188). Plaintiffs also dislike the fund, because it has not performed well. Plaintiffs devote a lot of ink in their amended complaint to the concept that actively-managed funds do not have a strong track record of beating the market. With respect to the CREF Stock Account in particular, plaintiffs allege that it has underperformed in one-, three-,

and five-year periods relative to the Russell 3000, the Vanguard Total Stock Market Index Fund, the Vanguard Institutional Index, the Vanguard PRIMECap-Adm and the Vanguard Capital Opp.-Adm.  (Am. Complt. ¶¶ 200, 202).

Based on these allegations, plaintiffs assert three counts (Counts I, III and V) for standard breach of fiduciary duty.  For each of those counts, plaintiffs assert a mirror-image count (Counts II, IV and VI) for breach of fiduciary duty based on a prohibited transaction.  In Count VII, plaintiffs assert that defendants Northwestern, Chinniah and Sunshine failed to monitor the other fiduciaries.  Defendants move to dismiss every count.

## II.    STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiffs fail "to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice.  *Twombly*, 550 U.S. at 555.  To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiffs.  *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018).  Conclusory allegations "are not entitled

to be assumed true," nor are legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 & 681 (2009) (noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement'"). The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679.

## III. DISCUSSION

### A. Defendants' motion to dismiss

"Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kinds of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Congress's goals in passing ERISA were to "ensure employees would receive the benefits they had earned" (*Conkright v. Frommert*, 559 U.S. 506, 516 (2010)) and to "induc[e] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards" (*Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002)). The Supreme Court has explained that Congress wanted to avoid creating "a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

Plaintiffs seek relief under 29 U.S.C. §§ 1132(a)(2) and 1109(a). ERISA § 502(a)(2) provides a private right of action "by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). ERISA § 409(a), in turn, provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter

shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary . . .

29 U.S.C. § 1109(a). A fiduciary is required to:

discharge his duties with respect to the plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

\* \* \*

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1). That section goes on to say:

(A) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)—

\* \* \*

(ii) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control, except that this clause shall not apply in connection with such participant or beneficiary for any blackout period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary.

29 U.S.C. § 1104(c)(1).

## 1. Count I

In Count I, plaintiffs allege that defendants breached their fiduciary duty by "allowing

TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account"

in the plans and by allowing TIAA-CREF to require the plans to use TIAA-CREF as record keeper for its proprietary funds. (Am. Complt. ¶ 235). The upshot of using TIAA-CREF as record keeper was that a portion of the expense ratios paid by participants when they invested in TIAA-CREF products was paid to TIAA-CREF for recordkeeping. (Am. Complt. ¶¶ 60-61, 147). Plaintiffs, as noted above, did not want the CREF Stock Account included as an investment option, because the fund: (a) underperformed; and (b) charged an expense ratio (.46%, with half going to TIAA-CREF for recordkeeping) that plaintiffs allege to be excessive compared to other funds (such as the TIAA-CREF S&P 500 Index with an expense ratio of .06%) available to plan participants. (Am. Complt. ¶¶ 135, 176, 188, 200, 202).

The Court fails to see how these allegations amount to a breach of fiduciary duty. To begin with, no plan participant was required to invest in the CREF Stock fund or any other TIAA-CREF product. (Am. Complt. ¶ 42). Thus, any plan participant could avoid what plaintiffs consider to be the problems with those products (excessive record-keeping fees and underperformance) simply by choosing other options. The plans, though, had valid reasons to use TIAA-CREF as record keeper for its products and to keep the CREF Stock Account as an *option* for plan participants. The valid reason, according to plaintiffs' own allegations, is that TIAA-CREF *required* the plans to use it as record keeper for its products and to offer CREF Stock Account if the plans were going to offer the TIAA-CREF Traditional Annuity. (Am. Complt. ¶ 117).

The plans had good reasons, which are outlined in plaintiffs' amended complaint, to offer the TIAA-CREF Traditional Annuity. According to plaintiffs' allegations, the TIAA-CREF Traditional Annuity is a fixed annuity contract that offers a contractually-specified minimum rate of return. (Am. Complt. ¶ 117). That is an attractive offering, particularly given that 403(b)

12

plans were originally *required* to offer *only* annuities. (Am. Complt. ¶ 76). The TIAA-CREF Traditional Annuity, though, had what even plaintiffs describe as "severe restrictions and penalties for withdrawal," including a 2.5% surrender charge. (Am. Complt. ¶¶117, 132). "A fiduciary must behave like a prudent investor under similar circumstances." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). It was prudent to keep the TIAA-CREF Stock Account as an option (which no one was required to choose) and to keep TIAA-CREF as record keeper for its own funds (which no one was required to choose) when the alternative was to subject some participants to a 2.5% surrender charge.

The Court also notes that the mere fact that plaintiffs believe index funds are a better long-term investment than the CREF Stock Account does not a fiduciary breach make. Low-cost index funds were available to plan participants (Am. Complt. ¶¶ 161, 176), and one can understand why they might prefer those funds to the CREF Stock Account. Anyone who has paid attention to stock-market or investment-strategy news over the last decade would be hard-pressed to disagree with the notion that the average investor will do better investing in low-cost index funds rather than in attempting either to select individual stocks or to select actively-managed mutual funds. What is good for the average investor, though, is not necessarily what is good for any particular individual. Warren Buffett, who has (famously) planned for his wife's money to be invested in low-cost index funds after his death, has (also famously) become one of the world's most-successful investors by choosing individual stocks that are undervalued in the grand tradition of Benjamin Graham's *The Intelligent Investor*. A professor of economics or finance might prefer investment options different from what a professor of music might choose. Ultimately, plaintiff's theory is paternalistic, but ERISA is not. As the Seventh Circuit said in *Loomis v. Exelon Corp.*:

13

> Plaintiff's theory is paternalistic. They appear to believe that participants should prefer captive funds, even with loss of liquidity, and should not be allowed to invest in the funds from Fidelity Group that Exelon's Plan now offers. . . . [T]hey want the judiciary to make these investments impossible. . . . [A]ll that matters is the absence from ERISA of any rule that forbids plan sponsors to allow participants to make their own choices. . . . Exelon offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense, low-risk, modest-return bond funds. It has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this.

*Loomis v. Exelon Corp.*, 658 F.3d 667, 673-674 (7th Cir. 2011) (affirming dismissal of claims).

Count I is dismissed for failure to state a claim.

### 2. Count III

In Count III, plaintiffs allege defendants breached their fiduciary duties by allowing the plans to pay record-keeping expenses through revenue sharing and by failing to prevent those fees from being excessive. (Am. Complt. 248-249).

As plaintiffs allege in their complaint, one way to pay for recordkeeping is to have each mutual fund share a portion of its expense ratio (a process called revenue sharing) with the record keeper. (Am. Complt. ¶¶ 60-61). That is how it was done in the case of these plans (Am. Complt. ¶¶ 145-146), and plaintiffs believe the fees were excessive. Plaintiffs allege that defendants should have used their bargaining power to solicit bids for record-keeping services that would be charged on a per capita basis (plaintiffs think $35/participant/year is reasonable) or at least limit the plans to a single record keeper. (Am. Complt. ¶¶ 249, 251). Plaintiffs allege that, between 2010 and 2015, participants in the Voluntary Plan paid an average of between $54 and $87 per participant per year (Am. Complt. ¶ 150) and that participants in the Retirement Plan paid an average of between $153 and $213 per participant per year (Am. Complt. ¶ 149). Given plaintiffs' allegation that in 2015 the Voluntary Plan held $530 million in net assets and had 12,293 participants, plaintiffs' allegations suggest an average expense ratio of .125% to .2%.

(Am. Complt. ¶ 16).  Given plaintiffs' allegations that in 2015 the Retirement Plan held $2.34 billion in net assets and had 21,622 participants, plaintiffs' allegations suggest an average expense ratio between .14% and .197%.  (Am. Complt. ¶ 12).  Plaintiffs seem to recognize that a per capita charge (instead of an expense ratio) tends to discourage and punish small investors, because plaintiffs allege that a per capita fee can, once calculated, be divided by the plans among the participants based on the amount each participant has invested.  (Am. Complt. ¶ 64).

Count III runs smack into *Hecker* and *Loomis*, where the Seventh Circuit affirmed dismissal of similar claims.  In *Hecker*, the Seventh Circuit said it did not violate ERISA to use revenue-sharing for plan expenses.  *Hecker*, 556 F.3d at 585.  There, the Seventh Circuit explained:

> Fidelity Trust . . . recovered its costs from the [plan] participants in the same way as it did from outside participants—that is, Fidelity Research would assess asset-based fees against the various mutual funds, and then transfer some of the money it collected to Fidelity Trust.
>
> The [plaintiffs'] case depends on the proposition that there is something wrong, for ERISA purposes, in that arrangement.  The district court found, to the contrary, that such an arrangement . . . violates no statute or regulation.  We agree with the district court. . . . [T]he participants were free to direct their dollars to lower-cost funds if that was what they wished to do.

*Hecker*, 556 F.3d at 585 (affirming dismissal of claims).

Thus, there is nothing wrong, for ERISA purposes, with the fact that the plan participants paid the record-keeper expenses via the expense ratios they paid.  Nor were defendants required to try to find a record-keeper willing to take $35/participant/year.  *Cf. Hecker*, 556 F.3d at 586 ("nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems.").  Furthermore, it is not clear that the plan could have arranged for lower prices.  As the Seventh Circuit explained in *Loomis*:

Now it isn't clear to us why mutual funds would offer lower prices just because participants in this Plan have pension wealth that in the aggregate exceeds $1 billion. [The Plan Administrator] can't commit that sum, or any portion of it, to any one fund without abandoning the arrangement under which the participants themselves choose where their money will be invested. The expenses of retail funds derive in large measure from the need to deal with investors one at a time: to receive and mail small checks, to print and mail individual prospectuses and account statements, frequently to exchange modest sums from one fund to another, and so on. Expenses per dollar under management necessarily are higher if the average account is $100,000 than if it is $100,000,000. Hertz gets a fleet discount from General Motors when it orders 10,000 cars at a time, but Hertz does not secure fleet discounts for members of its #1 Club to buy their own GM cars; retail transactions occur at retail prices. So too with retail transactions in mutual funds.

Likewise it isn't clear to us why participants would view a capitation fee as a gain. A flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a capitation fee could work out to more, per dollar under management, than a fee between .03% and .96% of the account balance.

*Loomis v. Exelon Corp.*, 658 F.3d 667, 672-673 (7th Cir. 2011).

In any case, the participants had options to keep the expense ratios (and, thus, record-keeping expenses) low. Plaintiffs' allege that participants could invest in the following funds at the following expense ratios: Fidelity 500 Index (Inst) (FXSIX) at an expense ratio of .05%; TIAA-CREF S&P 500 Index at an expense ratio of .06%; Fidelity Spartan 500 Index at .1%, Fidelity 500 Index at .1%, Fidelity International Index at .1%, Fidelity Total Market Index at .1% and Vanguard Small Cap Index at .1%. (Am. Complt. ¶¶ 161, 176). These are, as a matter of law, low.

The facts, as plaintiffs have alleged them, do not constitute a breach of fiduciary duty. Count III is dismissed.

### 3. Count V

In Count V, plaintiffs assert a similar claim for breach of fiduciary duty. This time, plaintiffs assert that the range of investment options was too broad. Plaintiffs also allege that the

fees charged by some funds were too high, either because they were retail funds with retail fees, because they had layers of fees that plaintiffs believe were "unnecessary" or because defendants failed to negotiate better fees. (Am. Complt. ¶¶ 264-266).

Once again, the Court cannot conclude that these allegations add up to a breach of fiduciary duty. Plaintiffs spend much of their lengthy amended complaint describing their clear preference for low-cost index funds, and the Court does not dispute that their preference is becoming conventional wisdom. Plaintiffs might have a different case if they alleged that the fiduciaries failed to make such funds available to them. Plaintiffs, though, allege that those types of low-cost index funds *were and are* available to them. Plaintiffs allege that participants could invest in the following funds at the following expense ratios, which are, as a matter of law, low: Fidelity 500 Index (Inst) (FXSIX) at an expenses ratio of .05%; TIAA-CREF S&P 500 Index at an expense ratio of .06%; Fidelity Spartan 500 Index at .1%, Fidelity 500 Index at .1%, Fidelity International Index at .1%, Fidelity Total Market Index at .1% and Vanguard Small Cap Index at .1%. (Am. Complt. ¶¶ 161, 176). It does not matter that some of those expenses were retail expenses (*Loomis*, 658 F.3d at 672), and it does not matter that the plans offered additional funds that they did not want to choose (*Loomis*, 658 F.3d at 673-674). The types of funds plaintiffs wanted were and are available to them.

Plaintiffs have alleged that the plans offered them the very types of funds they want. That is not a breach of fiduciary duty, and Count V is dismissed for failure to state a claim.

### 4.     Counts II, IV and VI

In Counts II, IV and VI. Plaintiffs assert that the things they allege to be breaches of fiduciary duty in Counts I, III and V also constitute transactions prohibited by ERISA.

Congress, in passing ERISA, prohibited certain transactions "deemed 'likely to injure the pension plan.'" *Harris Trust & Sav. Bank v. Saloman Smith Barney, Inc.*, 530 U.S. 238, 242 (2000) (quoting *Commissioner v. Keystone Consol. Ind., Inc.*, 508 U.S. 152, 160 (1993)). Specifically, ERISA § 406 states:

> Except as provided in section 1108 of this title:
>
> (1)  A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
>         \*   \*   \*
>
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan;

29 U.S.C. §1106(a).  Section 1108, in turn, exempts from the list of prohibited transactions "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."  29 U.S.C. § 1108(b)(2).  ERISA defines a "party in interest" as, among other things, "a person providing services to such plan[.]"  29 U.S.C. § 1002(14)(B).

Here, plaintiffs allege that defendants engaged in prohibited transactions:  (1) by allowing TIAA-CREF to require the plans to include the CREF Stock Account and to use TIAA-CREF as record keeper (Count II); (2) by not negotiating for a per capita record-keeping fee and by using two record keepers instead of one (Count IV); and (3) by paying fees to TIAA-CREF and Fidelity when plan participants invested in funds offered by those entities (Count VI).  Plaintiffs' theory is that defendants engaged in a prohibited transaction every time the plans paid fees to TIAA-CREF or Fidelity.  (Am. Complt. ¶ 243, 257, 276).

18

Defendants move to dismiss.  With respect to plaintiffs' attempt to hang their prohibited transaction theory on § 1106(a)(1)(D)—which prohibits "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan"—the Court agrees with defendants' argument that plaintiffs have not alleged a transfer of plan assets.  Plaintiffs allege that the record-keeping fees were paid to TIAA-CREF and Fidelity by the mutual funds via the expense ratios collected by mutual funds.  (Am. Complt. ¶¶ 145-146).  Once the Fidelity fund or the TIAA-CREF fund collected the expense ratio, that amount became the property of the respective mutual fund. Thus, the transfer of some of it for record-keeping costs was not a transfer of plan assets.  *See Hecker*, 556 F.3d at 584 (rejecting argument that revenue sharing constituted a transfer of plan assets, noting "[o]nce the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets—again, not assets of the Plans.").

Plaintiffs' next theory is that the transactions (every time the plans paid TIAA-CREF and Fidelity) were prohibited by § 1106(a)(1)(C), which prohibits fiduciaries from engaging in transactions that constitute the "furnishing of goods, services, or facilities between the plan and a party in interest."  29 U.S.C. § 1106(a)(1)(C).  Because ERISA defines a "party in interest as "a person providing services to such plan," section 1106(a)(1)(C) prohibits the "furnishing of . . . services . . . between the plan and [a person providing services to such plan]."  The language is obviously circular.  *See Sacerdote v. New York Univ.*, Case No. 16-cv-6284, 2017 WL 3701482 at 13 (S.D. N.Y. Aug. 25, 2017) ("[I]t is circular to suggest that an entity which becomes a party in interest by providing services to the Plans has engaged in a prohibited transaction simply because the Plans have paid for those services.").

A number of courts have recognized the circularity of the statute and have rejected attempts to state a claim for a prohibited transaction under that theory unless a plaintiff also

alleges something more, such as self-dealing or that the payments were secret. *Cunningham v. Cornell Univ.*, Case No. 16-cv-6525, 2017 WL 4358769 at *10 (S.D.N.Y. Sept. 29, 2017); *Sweda v. University of Penn.*, Case No. 16-4329, 2017 WL 4179752 at *11 (E.D. Penn. Sept. 21, 2017); *Sacerdote*, 2017 WL 3701482 at *13-14; *see also Patrico v. Voya Fin., Inc.*, Case No. 16-cv-7070, 2018 WL 1319028 at *6-7 (S.D.N.Y. Mar. 13, 2018).

This Court appreciates the circularity and agrees that it would be nonsensical to let a party state a claim for a prohibited transaction in violation of ERISA merely by alleging a plan paid a person for a service. That would be just the sort of litigation, the Court imagines, that Congress worried would discourage employers from offering ERISA plans. Still, the statute is not as circular as it appears, because the first words of 29 U.S.C. § 1106(a) are "[e]xcept as provided in section 1108 of this title," and 29 U.S.C. § 1108(b) says, the "prohibitions . . . in section 1106 . . . shall not apply" to "[c]ontracting . . . for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b). The solution, then, to eliminating nonsensical claims is to require a party asserting such a claim to allege that the exception does not apply.

This Court, however, is not at liberty to require a party to plead the exception, because the Seventh Circuit has already held that the exceptions in ERISA § 408, 29 U.S.C. § 1108, are affirmative defenses. *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 675 (7th Cir. 2016). A plaintiff is not required to plead around an affirmative defense. *Chicago Bldg Design, PC v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014); *United States Gypsum v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003). The only time it is appropriate to dismiss a claim based on an affirmative defense is when the plaintiff "plead[s] himself out of court by alleging (and

thus admitting) the ingredients of a defense." *United States Gypsum*, 350 F.3d at 626; *see also Mongolian House*, 770 F.3d at 614.

The Court concludes that plaintiffs have plead the ingredients of the defense, i.e., that the fees paid were reasonable, as a matter of law. The Court first notes that the amount of fees paid were within the control of participants, because they could choose in which funds to invest the money in their account. Funds were available with expense ratios as low as .05%. (Am. Complt. ¶¶ 161, 176). Plaintiffs have also alleged the actual amounts paid. Plaintiffs allege that, between 2010 and 2015, participants in the Voluntary Plan paid an average of between $54 and $87 per participant per year (Am. Complt. ¶ 150) and that participants in the Retirement Plan paid an average of between $153 and $213 per participant per year (Am. Complt. ¶ 149). Given plaintiffs' allegation that in 2015 the Voluntary Plan held $530 million in net assets and had 12,293 participants, plaintiffs' allegations suggest an average expense ratio of .125% to .2%. (Am. Complt. ¶ 16). Given plaintiffs' allegations that in 2015 the Retirement Plan held $2.34 billion in net assets and had 21,622 participants, plaintiffs' allegations suggest an average expense ratio between .14% and .197%. (Am. Complt. ¶ 12). These amounts are reasonable as a matter of law.

Plaintiffs' claims—Counts II, IV and VI—that defendants engaged in prohibited transactions are dismissed.

### 5.    Plaintiffs' claim for failure to monitor

In Count VII, plaintiffs assert that defendants Northwestern, Chinniah and Sunshine failed to monitor the other fiduciaries. Defendants move to dismiss this count, but plaintiffs did not respond. Accordingly, the Court deems the claim abandoned and any arguments against dismissing the claim forfeited. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011)

("We apply [the waiver/forfeiture rule] where a party fails to develop arguments related to a discrete issue, and we also apply that rule where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss."); *County of McHenry v. Insurance Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006) ("'[W]hen presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action.'") (quoting *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995)).

Count VII is dismissed.

### B.    Plaintiffs' motion for leave to amend

Plaintiffs filed a motion for leave to amend their complaint after more than a year of discovery, which was set to close a few days later. Plaintiffs seek to add four counts. Defendants argue that the Court should deny plaintiffs' motion to amend, because amendment would be futile and because plaintiffs could have amended sooner. Plaintiffs argue (confusingly) that they intend to add "just two limited claims" based "on previously unknown facts that were discovered during depositions of Defendants' representatives that began on March 22, 2018." (Plfs' Reply at 1/Docket [159] at 1).

The Court first notes that when plaintiffs filed their motion for leave to amend, they also filed a motion for leave to file their proposed second amended complaint under seal. The parties have not given the Court adequate reason to seal the filing. Litigation in federal courts is presumptively public, and people who "call on the courts . . . must accept the openness that goes with subsidized dispute resolution." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). "[O]nly trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence . . . is entitled to be kept secret." *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002).

Here, in the absence of a showing that one of those exceptions applies, the litigation is public, and the motion is denied.

### 1.    Proposed Count VII

In proposed Count VII of the proposed second amended complaint, plaintiffs allege that defendants included retail-class funds as investment options when they could and should have used their bargaining power to include identical versions of the same funds at below-retail prices. (Prop. 2d. Am. Complt. ¶¶ 340-341, 342).

The Court will not allow plaintiffs to add this count. The Court agrees with defendants that many of the facts underlying this count were alleged in plaintiffs' amended complaint, such that plaintiffs could and should have added this count sooner, if not as part of its amended complaint. In addition, proposed Count VII would be futile, because it fails to state a claim for the same reasons outlined in sections III.A.2. and III.A.3. above. Finally, plaintiffs did not respond to defendants' argument as to this claim, so it is deemed abandoned.

The Court denies plaintiffs leave to add Count VII.

### 2.    Proposed Counts IX and X

In proposed Counts IX and X, plaintiffs seek to hold defendants liable for allowing TIAA-CREF to market products to them. Plaintiffs allege that the plans allowed TIAA, as record keeper, to obtain access to "participants' contact information, their choices of investments, the asset size of their accounts, their employment status, age, and proximity to retirement[.]" (Prop. 2nd Am. Complt. ¶ 357). Plaintiffs allege that the information about participants constitutes a plan asset and that defendants breached their fiduciary duties: (1) by not preventing TIAA from using that information to market products to plaintiffs (Count IX);

and by engaging in a prohibited transaction (Count X). (Prop. 2nd Am. Complt. ¶¶ 357-358; 365-366).

The Court agrees with defendants that it would be futile to allow plaintiffs to add these claims, which have a number of problems. To begin with, it is in no way imprudent for defendants to allow TIAA, who is alleged to be a record keeper, to have access to each participant's contact information, their choice of investments, their employment status, their age and their proximity to retirement. TIAA needed that information in order to serve as record keeper. Next, defendants argue that disclosure of information does not implicate ERISA fiduciary functions, and that argument has some support. *See Davis v. Screen Actors Guild, Inc.*, Case No. 08-00913, 2008 WL 11336377 at *9 (C.D. Cal. April 17, 2008) (holding that plaintiff's claim "that the plans betrayed their trust by disclosing personal information" was not preempted by ERISA because the claim was "distinct from any available under ERISA"). Plaintiff has not responded to this argument or cited a single case in which a court has held that releasing confidential information or allowing someone to use confidential information constitutes a breach of fiduciary duty under ERISA. This Court will not be the first, particularly in light of Congress's hope that litigation would not discourage employers from offering plans and in light of the principle that breach of fiduciary duty remedies inure to the plans.

Plaintiffs fare no better on their theory that defendants engaged in prohibited transactions when they allowed TIAA to use plan participants' confidential information. The Court agrees with defendants that the information was not a plan asset. Plaintiffs argue that it is enough that they *allege* the confidential information to be a plan asset, but such an allegation is merely a legal conclusion. *Iqbal*, 556 U.S. at 680 & 681; *In re Fidelity ERISA Float Lit'n*, 829 F.3d 55, 59 (1st Cir. 2016) ("we need not credit the complaint's statement that float is a 'plan asset,' for

24

that label represents a legal conclusion"). Plaintiffs cite no case in which a court has held that such information is a plan asset for purposes of ERISA. This Court does not intend to be the first. In considering what constitutes a plan asset, courts consider "ordinary notions of property rights under non-ERISA law." *Fidelity*, 829 F.3d at 60. The Court has no doubt that a compilation of the information TIAA has on participants has some value (to TIAA, at least), but the Court cannot conclude that it is a plan asset under ordinary notions of property rights. The information the plans gave TIAA on each participant who joined one of the plans is not, for example, property the plan could sell or lease in order to fund retirement benefits. It does not appear that courts have recognized a property right in such information. *Cf. Rejimas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 695 (7th Cir. 2015) ("This assumes that federal law recognizes such a property right [as 'loss of their private information']. Plaintiffs refer us to no authority that would support such a finding. We thus refrain from supporting standing on such an abstract injury, particularly since the complaint does not allege that the plaintiffs could sell their personal information for value."); *see also Sexton v. Runyon*, Case No. 03-cv-291, 2005 WL 2030865 at *8 (N.D. Ind. Aug. 23, 2005) ("Though the law has considered various privacy interests in personal information , . . . the law does not frame these protections as property rights.").

The Court will not allow plaintiffs to add Counts IX and X.

### 3. Proposed Count VIII

Finally, in proposed Count VIII of the proposed second amended complaint, plaintiffs allege that defendants violated 29 U.S.C. § 1104(a)(1)(D), which requires an ERISA fiduciary to "discharge his duties" in "accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter

and subchapter III." 29 U.S.C. § 1104(a)(1)(D). Specifically, plaintiffs allege that in June 2015,

defendants adopted an Investment Policy Statement ("IPS") and then proceeded not to follow it.[2]

> The Investment Policy Statement says, among other things:
>
> Service providers should be monitored on a regular basis or more frequently if
> applicable. Administrative and/or recordkeeping service providers may be
> benchmarked against, but not limited to, industry averages and/or other providers
> quotes. … The monitoring of the plan provider(s) is to ensure that total plan
> costs and services are competitive and reasonable.
> * * *
> [A]ll investments under consideration should generally meet the following
> standards for selection:
>
> > 1. Investment performance should be competitive with an appropriate
> >    style-specific benchmark and the median return for an appropriate,
> >    style-specific peer group . . .
> > 2. Specific risk and risk-adjusted return measures should be reviewed
> >    by the Committee and be within a reasonable range relative to
> >    appropriate, style-specific benchmark and peer group;
> > * * *
> Investments where no objective performance metric is possible due to specialty
> focus or passively managed funds, short time history or other unique
> circumstances should be reviewed using a qualitative framework.

(Investment Policy Statement at 2-4/Docket [130-9] at 2-4). Plaintiffs allege that defendants

violated these provisions by retaining the CREF Stock Account and TIAA Real Estate Accounts,

by failing to monitor the performance and prudence of investments in the plans and by failing to

monitor costs, including record-keeping costs. (Prop. 2nd Am. Complt. ¶ 350-351).

Defendants first argue that this claim is futile. Defendants take issue with plaintiffs

allegation that defendants violated the IPS by including the CREF Stock Account and TIAA Real

---

[2] Defendants do not argue that the Investment Policy Statement is not a plan document or
instrument for purposes of 29 U.S.C. § 1104(a)(1)(D), so the Court assumes without deciding
that it could be. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 334 n. 5 (8th Cir. 2014) ("While we are
concerned that construing all investor policy statements as binding plan documents will
discourage their use, and we question whether a policy statement like the one in this case—
informally implemented to provide a framework for administering the Plan itself—constitutes a
binding Plan document, we need not resolve those issues here.").

Estate Account without comparing them to a benchmark. Defendants point out that plaintiffs specifically allege that the CREF Stock Account and TIAA Real Estate Account have no benchmarks such that defendants could not have compared it to a benchmark. (Prop. 2nd Am. Complt. ¶ 256). Defendants also point out that the IPS states that when evaluating funds that have no benchmark, the funds should be "reviewed using a qualitative framework" and that plaintiffs have not alleged they violated that procedure. The Court agrees that this portion of the claim does not set out a violation of the IPS.

That is not, however, all plaintiffs allege in Count VIII. They also allege that defendants violated the IPS by failing to monitor the performance and prudence of investments in the plans and by failing to monitor costs, including record-keeping costs. (Prop. 2nd Am. Complt. ¶ 350-351). Plaintiffs argue that they could not have made these claims sooner, because they first learned of them during depositions in March 2018. This is not compelling. Defendants have shown (via declaration) that they produced the Investment Policy Statement in August 2017. Allegations that defendants failed to monitor the prudence of investments and failed to monitor record-keeping costs were major themes in plaintiffs' amended complaint. Thus, plaintiffs could and should have added these claims much sooner. Waiting until the final few days of a discovery period that had lasted more than a year was undue. Leave to add this claim now is denied.

Finally, the Court notes that it reviewed the new allegations as to Counts I through VI and considered whether the new allegations changed the Court's analysis with respect to those claims. It has concluded that they do not.[3]

_____

[3] The Court notes that for some allegations, plaintiffs cited deposition transcripts, which they attached. Where the cited testimony conflicted with the allegation, the Court credited the attachment. *See Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d

Accordingly, plaintiffs' motion for leave to amend is denied.

## IV.     CONCLUSION

For the reasons set forth above, the Court grants defendants' motion to dismiss [58] and denies plaintiffs' motion for leave to amend [129].  Plaintiffs' motion for leave to file under seal [133] is denied.  All other pending motions are denied as moot. Any pending dates are stricken. Plaintiffs' case is dismissed with prejudice.  Civil case terminated.


**SO ORDERED.**                                    **ENTERED:**  May 25, 2018



**JORGE L. ALONSO**
**United States District Judge**

---

463, 466 (7th Cir. 2007) (citing *Perkins v. Silverstein*, 939 F.2d 463, 469 n. 4 (7th Cir. 1991) (in determining the sufficiency of the complaint the court may rely on exhibits to the complaint whenever the allegations of the complaint are materially inconsistent with those exhibits)).