In the

# United States Court of Appeals

### For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 18-2569

LAURA L. DIVANE, *et al.*,

*Plaintiffs-Appellants,*

*v.*

NORTHWESTERN UNIVERSITY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-08157 — **Jorge L. Alonso**, *Judge.*

ARGUED MAY 23, 2019 — DECIDED MARCH 25, 2020

Before BAUER, MANION, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Laura Divane and other plain-
tiffs,[1] beneficiaries of employee investment plans, sued North-
western University for allegedly breaching its fiduciary duties
under the Employee Retirement Income Security Act, 29

---

[1] April Hughes, Susan Bona, Katherine, Lancaster, and Jasmine Walker.

U.S.C. § 1001, *et seq.* The district court found no breach. Neither do we, so we affirm.

## I

There are two ERISA defined-contribution plans at issue in this case: the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan. Under the Retirement Plan, participating Northwestern University employees can contribute a portion of their salary to their account and Northwestern makes a matching contribution. Employees participating in the Voluntary Savings Plan also contribute a portion of their salary, but Northwestern does not make a matching contribution. Both plans allow participants to choose the investments into which the money in their account is invested and to choose among the investment options assembled by the plans' fiduciaries. Each plaintiff participates in one or both plans.

Northwestern is the administrator and designated fiduciary of both plans. It assigned some of its fiduciary administrative duties to university officials[2] and established a Retirement Investment Committee comprised of individual university officers[3] who exercised discretionary authority in managing the plans' assets. All are named defendants in this suit, and we collectively refer to them as "Northwestern" or "defendants."

---

[2] These officials include the university's executive vice president, Nimalam Chinniah, and former executive vice president, Eugene Sunshine.

[3] The Committee members are Ronald Braeutigam, Kathleen Hagerty, Craig Johnson, Candy Lee, William McLean, Ingrid Stafford, and Pamela Beemer.

Displeased with the administration of the plans, plaintiffs sued Northwestern for allegedly breaching its fiduciary duties under ERISA. Plaintiffs' amended complaint[4] is massive: 287 paragraphs over 141 pages. Most of plaintiffs' allegations, though, are not specific to certain defendants or to the plans here. For example, plaintiffs object to a wide range or mix of investment options, noting that approach can overwhelm an unsophisticated investor. They believe too many choices leaves the average investor with the "virtually impossible burden" of deciding where to place their money.

Before October 2016, the plans offered investments through the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund (TIAA-CREF) as well as Fidelity Management Trust Company. The Retirement Plan offered 242 investment options, and the Voluntary Savings Plan offered 187 options. Among the available options were mutual funds and insurance company annuities.[5]

---

[4] Plaintiffs filed their initial complaint on August 17, 2016, alleging two counts for breach of the defendants' duties of loyalty and prudence due to unreasonable administrative and management fees and performance losses, and one count for failure to monitor designated fiduciaries. Plaintiffs filed an amended complaint on December 15, 2016, adding three additional counts for prohibited transactions based on the same alleged breach conduct. In both complaints, plaintiffs requested a jury trial.

[5] These options represent a variety of investment offerings ranging from conservative to more aggressive. The annuity options offered here included fixed annuities, which provide participants with the assurance that they will have a stable income in retirement, and variable annuities, which carry some additional risk for the investor but allow for the possibility of a greater return.

In the four months leading up to October, these options were narrowed into four tiered categories from which participants could select their preferred investments:

- *Tier 1*: Target-date mutual funds that automatically rebalance their portfolios to become more conservative as the funds reach their target dates;

- *Tier 2*: Five index funds with a pre-selected set of stocks that eliminate trading and selection costs;

- *Tier 3*: 26 actively managed funds in which a manager or management team selects stocks;

- *Tier 4*: A full-service, self-directed brokerage window through which the participant invests his or her plan assets.

By October, Northwestern had streamlined its investment offerings to about 40 options to enable "simpler decision-making by participants, reduce administrative expenses, increase participant returns, and provide access to lower cost shares when available." Appellant Br. at 9. Plaintiffs argue Northwestern's conduct in adjusting its offerings should be treated as proof that its pre-2016 offerings were imprudent.

One of the TIAA-CREF investments that remained available to plan participants post-2016 was the TIAA-CREF Traditional Annuity, a fixed annuity contract that returns a guaranteed, contractually specified minimum interest rate. The Traditional Annuity has "severe restrictions and penalties for withdrawal," including a 2.5% surrender charge if a participant withdraws the investment in a lump sum sooner than 120 days after the termination of her employment. TIAA policy dictates that if the Traditional Annuity is offered as part of an investment plan, that plan must also offer the TIAA-

CREF Stock Account fund and use TIAA as the recordkeeper
for all TIAA offerings. Plaintiffs complain that the Stock Ac-
count charges excessive fees and has not historically per-
formed well.

Among the fees included in a fund's expense ratio are
costs for recordkeeping. Defined contribution plans require
recordkeepers to track the amount of each participant's ac-
count and how the account is allocated among investment op-
tions. Recordkeepers also maintain websites for participants
and sometimes provide investment advice or education ma-
terials. One way that plans (including those in this case) pay
for recordkeeping is to have the fund that collects the expense
ratio share part of the expense ratio with the recordkeeper.

Plaintiffs alleged Northwestern should have paid record-
keeping costs by assessing a flat annual fee based on the num-
ber of participants in each plan. Specifically, plaintiffs alleged
that some of the plan funds charged retail-rate expense ratios
to cover recordkeeping rather than institutional-rate expense
ratios. According to plaintiffs, a reasonable rate for record-
keeping fees would have been $35 per participant per year.
The amended complaint reflects that plan participants paid
an average of $54 to $87 per year for the Voluntary Savings
Plan and an average of $153 to $213 per year for the Retire-
ment Plan.[6] Plaintiffs argued these expenses are even higher
for plans that use multiple recordkeepers, as was the case
here.

---

[6] Plaintiffs allege that in 2015, the Voluntary Savings Plan held $530 mil-
lion and had 12,293 participants while the Retirement Plan held $2.34 bil-
lion and had 21,622 participants.

Six days before discovery was scheduled to close, plaintiffs sought leave to file a second amended complaint alleging four new counts for breach of fiduciary duty. Aside from the four new counts, the second amended complaint mirrored the causes of action and claims in the amended complaint. The four new counts alleged that Northwestern: (1) offered retail class funds as investment options instead of using their bargaining power to offer institutional class shares at lower prices; (2) violated Northwestern's Investment Policy Statement by failing to monitor investment performance and recordkeeping costs; and (3) allowed TIAA to access and use participant information to market its services to participants (two separate counts). These additional counts were based on information available to plaintiffs before discovery.

Plaintiffs sought monetary and injunctive relief and requested a jury trial and leave to file their proposed second amended complaint. Defendants moved to dismiss the amended complaint on every count, to deny leave to file the second amended complaint, and to strike plaintiffs' request for a jury trial.

## II

The district court granted defendants' motion to strike the jury demand, finding that the monetary relief sought by plaintiffs did not constitute damages but rather a form of equitable restitution that did not entitle plaintiffs to a jury trial. The court also denied plaintiffs' request for leave to file a second amended complaint and granted defendants' motion to dismiss the amended complaint on all counts.

In dismissing the amended complaint, the district court rejected plaintiffs' theory that Northwestern breached its

No. 18-2569                                          7

fiduciary duty by offering the Stock Account and allowing TIAA to serve as the recordkeeper for TIAA funds. First, as the court observed, "no plan participant was required to invest in the CREF Stock fund or any other TIAA-CREF product," so "any plan participant could avoid what plaintiffs consider to be the problems with these products … simply by choosing other options." *Divane v. Northwestern Univ.*, 2018 WL 2388118, at *6 (N.D. Ill. May 25, 2018). Moreover, "[t]he plans … had valid reasons to use TIAA-CREF as record keeper for its products." *Id.* According to plaintiffs' own allegations: "TIAA-CREF *required* the plans to use it as record keeper for its products and to offer [the] CREF Stock Account if the plans were going to offer the TIAA-CREF Traditional Annuity," a popular investing option. *Id.* The court concluded that "[i]t was prudent to keep the [TIAA-CREF] Stock Account as an option (which no one was required to choose) and to keep TIAA-CREF as record keeper for its own funds (which no one was required to choose) when the alternative was to subject some participants to [the] 2.5% surrender charge" imposed by the Traditional Annuity. *Id.*

Next, the district court rejected plaintiffs' claim that Northwestern breached its fiduciary duties by permitting excessive fees. Applying *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), the court held "there is nothing wrong, for ERISA purposes, with the fact that the plan participants paid the record-keeper expenses via … expense ratios." *Id.* at *8 (citing *Hecker*, 556 F.3d at 585 (holding the use of revenue-sharing for plan expenses did not amount to an ERISA violation)). Nor was Northwestern required to try to "find a record-keeper willing to take $35/participant/year," the rate that plaintiffs alleged was reasonable. *Divane*, 2018 WL 2388118 at *8. If plan

participants sought to keep expense ratios low, they had many investment options to do so.

In applying *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), the district court also rejected plaintiffs' claim that Northwestern breached its fiduciary duty because "the range of investment options was too broad." *Id.* at *8–9 (citing *Loomis*, 658 F.3d at 673–74 (holding that plans did not violate ERISA by offering additional funds participants did not want to choose)). The court explained that the "[p]laintiffs might have a different case if they alleged that the fiduciaries failed to make [the low-cost index funds preferred by plaintiffs] available to them." *Id.* at *8. But plaintiffs' allegations describe the freedom they had under the plans to invest in the fund options they wanted. *Id.* at *8–9 (plaintiffs "allege[d] that those types of low-cost index funds *were and are* available to them," showing that "the plans offered them the very types of funds they want[ed]."). The court concluded "these allegations [cannot] add up to a breach of fiduciary duty." *Id.* at *8.

The court further dismissed plaintiffs' claims that "the things [plaintiffs] allege to be breaches of fiduciary duty … also constitute transactions prohibited by ERISA." *Id.* at *9. These claims rest on the "[p]laintiffs' theory [that Northwestern] engaged in a prohibited transaction every time the plans paid fees to TIAA-CREF or Fidelity" for the same recordkeeping conduct alleged in the fiduciary duty claims. *Id.* The court found "plaintiffs' attempt to hang their prohibited transaction theory on § 1106(a)(1)(D)" ineffective.[7] *Id.*

---

[7] 29 U.S.C. § 1106(a)(1)(D) prohibits the plan fiduciary from engaging in a transaction that he knows or should know would constitute a direct or

Once collected as an expense ratio by a TIAA-CREF fund or a Fidelity fund, the amount of the recordkeeping fees "became the property of the respective mutual fund," and "[t]hus, the transfer of some of it for recordkeeping costs was not a transfer of plan assets." *Id.* (citing *Hecker*, 556 F.3d at 584 (rejecting argument that revenue sharing constituted a transfer of plan assets "[o]nce the fees are collected from the mutual fund's assets and transferred to [the recordkeeper], they become [the recordkeeper's] assets—again, not assets of the Plans")). The court concluded "that plaintiffs have plead the ingredients of [an affirmative] defense" by providing evidence "that the fees paid were reasonable, as a matter of law." *Id.* at *10 (quoting *United States Gypsum v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003) (only appropriate time to dismiss a claim based on an affirmative defense is when plaintiff "plead[s] [himself] out of court by alleging (and thus admitting) the ingredients of a defense.")).[8]

In denying plaintiffs' motion for leave to file a second-amended complaint, the district court found the proposed new counts were untimely, futile, and abandoned. "[A]fter more than a year of discovery," *id.* at *11, and within just six days of the close of discovery, plaintiffs sought to add four new counts. The court separately analyzed each. On proposed Count VII, alleging Northwestern should have offered investment options at below-retail prices, the court found "that many of the facts underlying this count were alleged in

---

indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

[8] The court also considered plaintiffs' failure-to-monitor claim and dismissed it as abandoned. *Id.* at *11.

plaintiffs' amended complaint, such that plaintiffs could and should have added this count sooner." *Id.* The court also found the count futile for failing to state a claim and abandoned because plaintiffs did not respond to defendants' arguments.

With respect to proposed Count VIII, alleging that the Retirement Investment Committee violated its investment policy statement, the court found the claim to be both futile and untimely because plaintiffs had knowledge of the relevant allegations for at least eight months and "[w]aiting until the final few days of a discovery period that had lasted more than a year was undue." *Id.* at *13–14. Regarding proposed Counts IX and X, alleging Northwestern improperly allowed TIAA to access and use participant data, the court held that both claims were futile because it was "in no way imprudent" to allow TIAA access to participants' information as necessary "to serve as a record keeper." *Id.* at *12. The court noted plaintiffs' failure to "cite[] a single case in which a court has held that releasing confidential information or allowing someone to use confidential information constitutes a breach of fiduciary duty under ERISA" or "that such information is a plan asset" in a prohibited transaction. *Id.*

Finally, in granting defendants' motion to strike the jury demand, the district court acknowledged ERISA's historical roots in trust law, which provides equitable, but not legal, remedies. *Divane v. Northwestern Univ.*, 2018 WL 1942649 at *1 (N.D. Ill. April 25, 2018) (citing *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015) (noting that ERISA fiduciary law is derived from trust law)). In considering ERISA's "statutory antecedents," this court has concluded that plaintiffs have no right to a jury trial in ERISA cases. *See Patton v. MFS/Sun Life Fin.*

*Distrib., Inc.*, 480 F.3d 478, 484 (7th Cir. 2007); *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 576 (7th Cir. 2007); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998). Recognizing this court's precedent, the district court denied plaintiffs' request for a jury trial. *See Divane*, 2018 WL 1942649 at *3.

## III

On appeal we review whether the district court erred by dismissing plaintiffs' amended complaint for failing to state a claim for relief under ERISA, denying plaintiffs' request to file a second-amended complaint, and rejecting plaintiffs' demand for a jury trial. For the reasons below, we find no error.

## A

This court reviews dismissals under Federal Rule of Civil Procedure 12(b)(6) de novo and may affirm the district court's decision on any ground for dismissal contained in the record. *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 910 (7th Cir. 2013); *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017). "We construe the complaint in the light most favorable to plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor." *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). But we "need not accept as true statements of law or unsupported conclusory factual allegations," *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009), or "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007).

A district court may dismiss a claim pursuant to Rule 12(b)(6) if plaintiff fails to "state a claim upon which relief can

Case: 2569   Document: 171-1   Filed: 08/05/2020   Pages: 25

be granted." FED. R. CIV. P. 12(b)(6). A complaint must "give the defendant fair notice of what … the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a plaintiff need not provide detailed factual allegations, mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Id.; see also Iqbal*, 556 U.S. at 678–79 (the notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). Instead, to survive a motion to dismiss, a claim must be plausible. *Iqbal*, 556 U.S. at 679 (finding the court must be able to infer from the allegations "more than the mere possibility of misconduct"); *see also Twombly*, 550 U.S. at 570 (allegations must "nudg[e] [plaintiff's] claims across the line from conceivable to plausible"). When claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable. *See Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) ("[A] prudent fiduciary in the same position could not have concluded that the alternative action would do more harm than good.") (cleaned up); *see also Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011) (no "hypothetical prudent fiduciary" would have made the same objective choice).

Plaintiffs have alleged Northwestern breached its fiduciary duty as a prudent investor, and they now seek relief under ERISA, 29 U.S.C. §§ 1132(a)(2) and 1109(a). As the plans' fiduciary, Northwestern is required to "discharge [its] duties with respect to the plan[s] solely in the interest of the participants and beneficiaries" in a manner that "defray[s] reasonable expenses of administering the plan[s]" and "with the care, skill, prudence, and diligence … that a prudent man" would use. 29 U.S.C. § 1104(a). In their amended complaint, plaintiffs specifically alleged that Northwestern failed to act as a

prudent fiduciary when it included the Stock Account as a
plan investment offering and allowed TIAA-CREF to serve as
a recordkeeper for its funds (Count I); created a multi-entity
recordkeeping arrangement (Count III); and provided invest-
ment options that were too numerous, too expensive, and un-
derperforming (Count V). In Counts II, IV, and VI, plaintiffs
claimed the above conduct also constituted prohibited trans-
actions under ERISA. *Id.* § 1106.

## 1

Plaintiffs alleged Northwestern breached its fiduciary
duty by "allowing TIAA-CREF to mandate the inclusion of
the CREF Stock Account" in the plans and by allowing TIAA
to serve as recordkeeper for its funds. Plaintiffs' own allega-
tions, though, contradict this claim. As plaintiffs note in their
amended complaint, many plan participants invested money
in the Traditional Annuity, which was an attractive offering
because it promised a contractually specified minimum inter-
est rate. Plaintiffs do not allege it was imprudent for the plans
to offer the Traditional Annuity. Instead, plaintiffs object to
the plans offering additional TIAA products (including the
Stock Account) and to TIAA serving as the recordkeeper for
those products. This ignores the benefit of using TIAA as a
recordkeeper—under that arrangement, the plans were able
to offer participants continued access to the popular Tradi-
tional Annuity.

Assuming plaintiffs' allegations are true, they fail to show
an ERISA violation. Under the plans, no participant was re-
quired to invest in the Stock Account or any other TIAA prod-
uct. Any participant could avoid what plaintiffs consider to
be the problems with those products (excessive recordkeep-
ing fees and underperformance) simply by choosing from

hundreds of other options within a multi-tiered offering system. Participants were not bound to the terms of any TIAA funds simply because they were included in the plans. The allegations instead depict valid reasons for the plans to use TIAA as a recordkeeper and to keep the Stock Account as an *option* for participants. According to plaintiffs' own allegations, TIAA required the plans to use it as a recordkeeper for its products and to offer participants the Stock Account if the plans offered the Traditional Annuity. Given the favorable terms and attractive offerings of the Traditional Annuity, which are outlined in plaintiffs' amended complaint, it was prudent for Northwestern to accept conditions that would ensure the Traditional Annuity remained available to participants. This is especially true considering participants with existing Traditional Annuity funds would be subject to a surrender charge of 2.5% if that offering was removed.

Rather than compare Northwestern's actions to those of a "hypothetical prudent fiduciary," *Renfro*, 671 F.3d at 322, plaintiffs criticize what may be a rational decision for a business to make (and, indeed, several do) when implementing an employee benefits program. But "[n]othing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kinds of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). That plaintiffs prefer low-cost index funds to the Stock Account does not make its inclusion in the plans a fiduciary breach.

In *Loomis*, this court acknowledged the difficulty with trying to enforce benefit program preferences through ERISA. We noted:

Case: 1:16-cv-08157 Document #: 192 Filed: 05/19/20 Page 15 of 25 PageID #:3395
Case: 1:16-cv-08157 Document #: 192 Filed: 05/19/20 Page 15 of 25 PageID #:3395
Case: 18-2569      Document: 00713515626      Filed: 05/19/2020      Pages: 25

> Plaintiff's theory is paternalistic. … [T]hey want
> the judiciary … to make [non-preferred] invest-
> ments impossible. … [The plan sponsor here]
> offered participants a menu that includes high-
> expense, high-risk, and potentially high-return
> funds, together with low-expense, low-risk,
> modest-return bond funds. It has left choice to
> the people who have the most interest in the
> outcome, and it cannot be faulted for doing this.

*Loomis*, 658 F.3d at 673–74 (affirming dismissal of claims, not-
ing "the absence from ERISA of any rule that forbids plan
sponsors to allow participants to make their own choices").
The same logic applies here and leads us to again conclude
that it would be beyond the court's role to seize ERISA for the
purpose of guaranteeing individual litigants their own pre-
ferred investment options.

### 2

Plaintiffs also alleged Northwestern breached its fiduciary
duties by establishing a multi-entity recordkeeping arrange-
ment that allowed recordkeeping fees to be paid through rev-
enue sharing. On appeal, plaintiffs propose alternative
recordkeeping arrangements they would have preferred. For
example, plaintiffs argue Northwestern should have imple-
mented a negotiated total fee based on a flat recordkeeping
fee, which could have been "allocated to participants." App.
Br. at 40. But plaintiffs fail to support their claim that a flat-fee
structure is required by ERISA, *see Hecker*, 556 F.3d at 585 (as-
set-based fees "violate[] no statute or regulation"), or would
even benefit plan participants. Indeed, such a structure may
have the opposite effect of increasing administrative costs by
failing to match the pro-rata fee that individual participants

could achieve at a lower cost through exercising their invest-
ment options in a revenue-sharing structure.[9] Either way, this
court has recognized that although total recordkeeping fees
must be known to participants, they need not be individually
allocated or based on any specific fee structure. *See Hecker*, 556
F.3d at 586 (finding so long as participants knew "the total
fees for the funds, … [t]his was enough").

In their amended complaint, plaintiffs alleged that
Northwestern should have solicited competitive bids for a
fixed per-capita fee ($35 per year per participant) by a single
recordkeeper instead of using two separate recordkeepers,
TIAA and Fidelity. According to plaintiffs, multiple record-
keeping arrangements impose higher costs on plan partici-
pants. Northwestern, though, explained it was prudent to
have this arrangement so it could continue offering the Tradi-
tional Annuity among its offerings. If Northwestern removed
TIAA and hired a third-party recordkeeper, participants
would have lost access to the Traditional Annuity and any
funds invested in the annuity would have been subject to the
2.5% surrender charge. We disagree with plaintiffs' theory
that Northwestern was required to seek a sole recordkeeper
to satisfy its fiduciary duties, finding Northwestern's decision
to maintain two recordkeepers prudent.

To the extent plaintiffs alleged Northwestern should have
selected TIAA as its sole recordkeeper, that assertion also fails

---

[9] *See* Amicus Br. for the U.S. Chamber of Commerce in Supp. of Appellees
at 9, ECF No. 42 (describing "revenue sharing" as "a common practice in
which service providers of mutual funds share a percentage of the fees
they receive with the administrative-service provider of a particular
plan … which can help defray participants' recordkeeping and other ad-
ministrative costs").

to state a claim for relief. Plaintiffs' amended complaint contains no allegation that plan participants would have been better off with TIAA as the sole recordkeeper. The complaint does not include Fidelity's recordkeeping costs, and it fails to allege that those costs are the reason for higher fees. Regardless, ERISA does not require a sole recordkeeper or mandate any specific recordkeeping arrangement at all. *See Renfro*, 671 F.3d at 319 (upholding as prudent plans that used multiple recordkeepers). Plaintiffs' suggestion (both in their amended complaint and now on appeal) to the contrary is undercut by this court's decisions in *Loomis* and *Hecker*.

In *Loomis*, this court rejected the argument plaintiffs now advance that a flat-fee recordkeeping rate is always prudent. *See Loomis*, 658 F.3d at 672–73 ("A flat-fee structure might be beneficial for participants with the largest balances," but for participants with smaller balances, it "could work out to more, per dollar under management."). Again, plaintiffs' allegations seem to rely on their disapproval of TIAA's role as recordkeeper rather than any imprudent conduct by Northwestern. But, according to plaintiffs' own allegations, Northwestern had "valid reasons" for the recordkeeping arrangements they chose, undermining plaintiffs' imprudent fiduciary claims.

Likewise, in *Hecker*, a revenue sharing arrangement that paid plan expenses did not constitute an ERISA violation. *Hecker*, 556 F.3d at 585. This court explained:

> Fidelity Trust … recovered its costs from the [plan] participants in the same way as it did from outside participants—that is, Fidelity Research would assess asset-based fees against the

> various mutual funds, and then transfer some of
> the money it collected to Fidelity Trust.
>
> The [plaintiffs'] case depends on the proposition
> that there is something wrong, for ERISA pur-
> poses, in that arrangement. The district court
> found, to the contrary, that such an arrange-
> ment … violates no statute or regulation. We
> agree with the district court. … [T]he partici-
> pants were free to direct their dollars to lower-
> cost funds if that was what they wished to do.

*Hecker*, 556 F.3d at 585 (affirming dismissal of claims). There is, then, nothing wrong—for ERISA purposes—with plan participants paying recordkeeper costs through expense ratios. Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked. *See id.* at 586 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."). Plaintiffs have identified no alternative record-keeper that would have accepted such a low fee or any fee lower than what was paid to Fidelity and TIAA. And plaintiffs have failed to explain how a hypothetical lower-cost record-keeper would perform at the level necessary to serve the best interests of the plans' participants.[10] We find no ERISA violation with Northwestern's recordkeeping arrangement.

---

[10] At any rate, plan participants had options to keep the expense ratios (and, therefore, recordkeeping expenses) low. The amount of fees paid were within the participants' control because they could choose which funds to invest the money in their account. *See Divane*, 2018 WL 2388118 at *10. Participants could invest in various low-cost index funds with ex-pense ratios ranging between .05% and .1%: Fidelity 500 Index (Inst)

**3**

Plaintiffs further alleged Northwestern breached its fidu-
ciary duties by providing investment options that were too
numerous, too expensive, or underperforming. As alleged,
some of these options were retail funds with retails fees, some
had "unnecessary" layers of fees, and some could have been
cheaper but Northwestern failed to negotiate better fees. Am.
Compl. ¶¶ 264–66. Plaintiffs also spill much ink in their
amended complaint describing their clear preference for low-
cost index funds. We understand their preference and
acknowledge the industry may be trending in favor of these
types of offerings. Am. Compl. ¶¶ 188–205. Plaintiffs failed to
allege, though, that Northwestern did not make their pre-
ferred offerings available to them. In fact, Northwestern did.
Plaintiffs simply object that numerous additional funds were
offered as well. But the types of funds plaintiffs wanted (low-
cost index funds) "*were and are* available to them," *Divane*,
2018 WL 2388118 at *8, eliminating any claim that plan partic-
ipants were forced to stomach an unappetizing menu.

_____

(FXSIX) at an expense ratio of .05%; TIAA-CREF S&P 500 Index at .06%;
Fidelity Spartan 500 Index at .1%; Fidelity 500 Index at .1%; Fidelity Inter-
national Index at .1%; Fidelity Total Market Index at .1%; Vanguard Small
Cap Index at .1%. *Id.* at *8. Am. Compl. ¶¶ 161, 176. Based on plaintiffs'
allegations regarding the number of plan participants and the individual
fees paid, average expense ratios for the plans ranged between .125% to
.2% (for the Voluntary Savings Plan) and between .14% and .197% (for the
Retirement Plan), with average recordkeeping costs lower than these
ranges. *See id.* at *10. App. Br. at p. 33. The available investment options,
then, reflect expense ratios that are low, *id.* at *8, and fees that "are reason-
able as a matter of law." *Id.* at *10.

Regarding retail fees, plaintiffs invoke the Eighth Circuit's decision in *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), as applied by this court in *Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016), to suggest a blanket prohibition on retail share classes. But *Allen* cited *Braden* only to support its analysis of the pleading burden for prohibited transaction claims under ERISA, *see Allen*, 835 F.3d at 676, 678, not to question the prudence of offering retail share class funds. Moreover, *Braden* is distinguishable on its facts. There, the court found imprudence because the investment plan included a "relatively limited menu of funds"—ten—which "were chosen to benefit the trustee at the expense of the participants." *Braden*, 588 F.3d at 596; *see Loomis*, 658 F.3d at 671 (distinguishing *Braden* on that basis). The plans here offered hundreds of options—over 400 combined—making a claim of imprudence less plausible. *See Braden*, 588 F.3d at 596 n.6.

Similarly, plaintiffs rely on the Third Circuit's holding in *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019), to find "a meaningful mix and range of investment options [does not] insulate[] plan fiduciaries from liability for breach of fiduciary duty." 923 F.3d at 330. But despite plaintiffs' contention to the contrary, the court did not disregard the mix of offered investment options. Rather, the court in *Sweda* declined to find a "bright-line rule that providing a range of investment options satisfies a fiduciary's duty" because "[p]ractices change over time, and bright-line rules would hinder courts' evaluation of fiduciaries' performance against contemporary industry practices." *Id.* (internal quotations omitted). The court determined it need not look only at the available range of offerings but would consider that range in the context of the fiduciary's overall performance. The court reiterated that "ERISA fiduciaries have a duty to act prudently according to current

practices," and that any "breach claim must be examined against the backdrop of the mix and range of available investment options." *Id.* The Third Circuit's approach is sound and not inconsistent with our own.

We concluded in *Hecker* and *Loomis* that plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty. *Loomis*, 658 F.3d at 673–74; *Hecker*, 556 F.3d at 586 (no breach of fiduciary duty where 401(k) plan participants could choose to invest in 26 investment options and more than 2,500 mutual funds through a brokerage window). Concerning the plans' alleged underperformance, this court has determined "the ultimate outcome of an investment is not proof of imprudence." *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 465 (7th Cir. 1990); *see also Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) ("Investment losses are not proof that [a fiduciary] violated his duty of care."). We see both principles at play in this case. Not only did Northwestern provide the plans with a wide range of investment options, it also provided prudent explanations for the challenged fiduciary decisions involving alleged losses or underperformance. Plaintiffs pleaded the same prudent reasons in their amended complaint. We echo the district court in concluding that such allegations do not add up to a breach of fiduciary duty.

**4**

In their amended complaint, plaintiffs also attempted to repackage their imprudent fiduciary claims as prohibited transactions claims. They relied largely on the same facts and allegations and provided no independent argument showing those facts or allegations reveal impermissible transactions. Plaintiffs merely assert that each allegedly unreasonable fee

collected from plan participants for recordkeeping costs con-
stituted a prohibited transaction under ERISA, 29 U.S.C.
§ 1106(a)(1)(D).

Under § 1106(a)(1)(D), a fiduciary is prohibited from en-
gaging in a transaction he knows or should know "constitutes
a direct or indirect transfer to, or use by or for the benefit of a
party in interest, of any assets of the plan." Here, plaintiffs
failed to plausibly allege the basic elements of their claim;
namely, that any defendant benefited from the collected fees,
that the fees were assets of the plans, or that any defendant
knew or should have known that collecting routine fees may
violate ERISA. In fact, this court has held that after a fee is
collected by a recordkeeper, the amount of those fees becomes
the property of the fund such that the transfer of some of it for
recordkeeping costs is not a transfer of plan assets. *See Hecker*,
556 F.3d at 584 ("Once the fees are collected from the mutual
fund's assets and transferred to [the recordkeeper], they be-
come [the recordkeeper's] assets—again, not assets of the
Plans")). Ignoring their pleading burden, plaintiffs concluded
that dismissal of their claims on this ground should be re-
versed for the same reasons they argued the above claims
should be reversed. For the same reasons we discussed above
on the fiduciary duty claims, plaintiffs have failed to state a
prohibited transaction claim.

***

Construing the facts and allegations in plaintiffs' favor, the
amended complaint fails to plausibly allege a breach of fidu-
ciary duty under ERISA. Taken as a whole, the amended com-
plaint appears to reflect plaintiffs' own opinions on ERISA
and the investment strategy they believe is appropriate for
people without specialized knowledge in stocks or mutual

funds. Ultimately, defendants "cannot be faulted for" leaving "choice to the people who have the most interest in the outcome." *Loomis*, 658 F.3d at 673–74.

## B

We consider now the district court's denial of plaintiffs' request to file a second amended complaint. This court reviews a denial of a motion for leave to amend a complaint for abuse of discretion. *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009). "[D]istrict courts have broad discretion to deny leave to amend where there is undue delay, … undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). "A new claim is futile if it would not withstand a motion to dismiss." *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001).

In their proposed second amended complaint, plaintiffs sought to add four new claims, three regarding breach of fiduciary duty generally and one regarding prohibited transactions. The district court denied plaintiffs' request for leave to file the second amended complaint for two reasons: plaintiffs unduly delayed bringing the claims, and the four proposed counts failed to state claims for relief and did not state new or additional claims. We agree.

Plaintiffs did not even attempt in their brief to explain the undue delay. Instead, plaintiffs note they were "separat[ing] out" the claims that had previously been included in the amended complaint as Count V. And, as further evidenced by plaintiffs' desire to separate out their underlying claims, none of the four new claims advance arguments that were unavailable to plaintiffs at the time they asked the court for leave to

file their second amended complaint. Although plaintiffs dress up the claims with different language in the second amended complaint, they rely on the same allegations and facts, revealing these claims as essentially the same claims separated into different counts. Because they are essentially the same claims, they too suffer from a lack of proper pleading.

## C

Finally, we consider the district court's decision to reject plaintiffs' jury demand. This court reviews de novo the determination that no right to a jury trial exists. *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004).

Although we need not reach the district court's decision here because we affirm dismissal, it is worth noting the court's general position on this point. The Supreme Court has held there is no right to a jury trial on this type of claim. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011) ("[A] suit by a beneficiary against a plan fiduciary (whom ERISA typically treats as a trustee) … is the kind of lawsuit that, before the merger of law and equity, [plaintiffs] could have brought only in a court of equity, not a court of law."). This court has held the same: "The general rule in ERISA cases is that there is no right to a jury trial because ERISA's antecedents are equitable, not legal." *McDougall*, 494 F.3d at 576 (quoting *Mathews*, 144 F.3d at 468); *see also Patton*, 480 F.3d at 484 (recognizing the "general rule in ERISA cases, where the plaintiff has no right to a jury trial"). Because this case involves a suit against a fiduciary for breach of trust, the traditional equitable remedy is surcharge (the requirement to make the beneficiary whole for any losses caused by the breach), not a legal remedy. *See CIGNA*, 563 U.S.

No. 18-2569                                                        25

at 440–43. We follow binding precedent and conclude no right
to a jury trial exists in this ERISA case.

### IV

   For the reasons above, we AFFIRM the district court's dis-
missal of plaintiffs' amended complaint on all counts and
AFFIRM the decision to deny plaintiffs' request for leave to
further amend the complaint and for a jury trial.